First Division
February 26, 2007

No. 1-05-1354

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiff-Appellee, | ) | of Cook County |
| | ) | |
| v. | ) | 02 CR 06193 |
| | ) | |
| VICENTE LOPEZ, | ) | |
| | ) | Honorable |
| Defendant-Appellant. | ) | John J. Scotillo |
| | ) | Judge Presiding |

PRESIDING JUSTICE McBRIDE delivered the opinion of the court:

Following a jury trial, defendant, Vicente Lopez, was found guilty of first degree murder and sentenced to 75 years' imprisonment. On appeal, defendant contends that: (1) he received ineffective assistance of counsel; (2) the trial court abused its discretion when it failed to instruct the jury on second degree murder based on provocation resulting from mutual combat; (3) the court erred when it allowed the State to introduce prejudicial other crimes evidence; and (4) the court erred when it failed to properly admonish the jury concerning other crimes evidence.

Defendant was arrested and charged by indictment with six counts of first degree murder in connection with the shooting death of his wife, Blanca Lopez, which occurred during the early morning hours of February 10, 2002. Prior to trial, the State filed a motion to admit evidence that defendant had pointed a gun at Blanca on three occasions prior to the murder, and evidence that gunshots had previously been fired in defendant's house. Over defense counsel's objection, the court ruled that the other crimes evidence was admissible, stating that its probative value outweighed its prejudice to defendant, and that, given defendant's theory that the shooting was an accident, the evidence was relevant to show motive, intent, and absence of mistake.

The following evidence was presented at defendant's trial.

Dr. J. Scott Denton, a forensic pathologist and deputy medical examiner at the Cook County medical examiner's office, testified that on February 11, 2002, he performed an autopsy on Blanca Lopez. Blanca was 5 feet 5½ inches tall and weighed 117 pounds. In Dr. Denton's opinion, Blanca died of a "contact range" gunshot wound to the head that entered immediately in front of her left ear and exited behind and above her right ear. Dr. Denton testified that "contact range" means that the muzzle of the weapon was against the skin when it was fired. The direction of Blanca's wound was front to back, left to right, and upwards. Dr. Denton concluded that the manner of Blanca's death was a homicide.

Dr. Denton observed several areas of red abrasion or scraping on the back of Blanca's right hand which had been recently created. Dr. Denton could not determine what caused the abrasions, but testified that they could have been caused by a fight. Dr. Denton examined the area under Blanca's fingernails, which was clean and did not contain any skin or dirt. Toxicology blood samples revealed that Blanca had a "fairly high" blood-alcohol level, between .23 and .29 grams per hundred milliliters.

Josephine Knust, an emergency communications operator for the City of Elgin, testified that she fielded a 911 call at 7 a.m. on February 10, 2002. The 911 tape was entered into evidence and published to the jury. On that tape, the caller asked for a Spanish interpreter, provided his address as 817 Parkway, Elgin, Illinois, and stated "I've got a problem." Once the 911 operator obtained a Spanish interpreter, the caller stated that he needed an ambulance because he shot his wife in the head. The caller identified himself as defendant and his wife as

Blanca Lopez.

Elgin police officer Mike Gartner testified that at approximately 7 a.m. on February 10, 2002, he was dispatched to 817 Parkway in Elgin, Illinois. Soon after arriving at that location, defendant came out of the house and was taken into custody by police. Officer Gartner testified that defendant was not stumbling or acting belligerent and that he did not appear to be intoxicated. Officer Gartner entered the house and found Blanca in a downstairs bedroom lying on her right side on a bed. Her head was resting on a pillow, and her right arm was underneath the pillow, "more or less cradling [it]." Officer Gartner observed an extensive wound to the right side of Blanca's head and noticed a stainless steel revolver lying on the floor.

Detective Steven Bianchi of the Elgin police department testified that he met with defendant at the Elgin police department jail at approximately 8 a.m. on the day of the shooting. Detective Bianchi took samples from red stains that were on defendant's face and was present when Detective Gough performed a gunshot residue kit on defendant's hands to determine if they had been in close contact with a fired weapon.

Detectives Bianchi and Gough then went to defendant's house and did a "walk-through" of the crime scene. Over defense counsel's objection, the court allowed Detective Biachi to testify about several holes he found in the house which he believed were bullet holes. In an upstairs bedroom, Detective Bianchi observed a hole in the door that appeared to line up with another hole in the ceiling of that bedroom. The detective also observed a hole in a wall of the downstairs east bedroom, where Blanca was found, and "other holes" in the downstairs northwest bedroom. Detective Bianchi testified that he believed these holes were created by a projectile

fired from a gun and that he and Detective Gough cut a hole in the wall of the downstairs northwest bedroom and recovered a projectile fired from a gun. Detective Bianchi did not send that projectile for a ballistics analysis.

Detective Bianchi also took photographs of Blanca as he found her lying in bed. He testified in substantially the same manner as did Officer Gartner regarding Blanca's position in bed and added that she was partially covered by a blanket. Detective Bianchi photographed the firearm next to the bed, which he identified as a .357 Magnum containing five live rounds and one fired round. The detective found other "miscellaneous rounds" in defendant's home. On that same date, Detective Bianchi went to an auto repair shop where defendant worked and found a box of .357 Magnum shells.

On cross-examination, Detective Bianchi testified that there were red marks on defendant's face which tested positive for blood and that a photograph he took showed that there were "numerous" beer cans in the kitchen of defendant's house.

Michael Putzek, a forensic scientist for the Illinois State Police, testified that he conducted a trigger pull analysis on the .357 found at the scene to determine the amount of pounds required to discharge the weapon. He determined that when the hammer was cocked, it took approximately four pounds to pull the trigger, and that when the hammer was not cocked, it took approximately 10 pounds.

Jorge Lopez (Jorge), Blanca's son and defendant's stepson, testified over defense counsel's objection to three prior incidents when defendant pointed a gun at Blanca. In December of 1999, Jorge observed defendant point a gun at Blanca during an argument over the

music she was playing. Jorge testified that "[b]asically the same event" occurred approximately one week later. Finally, Jorge testified to an incident that occurred in November of 2001, when defendant and Blanca were living at 817 Parkway in Elgin. Jorge entered the dining room of the house and observed defendant "cock" a gun, point it at Blanca, and tell her to "shut up." Jorge stepped between Blanca and defendant and, while Jorge had defendant's hand over his left shoulder, the gun went off. More arguing ensued, and the gun went off again while Jorge was trying to bring it down away from his head. This was the only time Jorge saw defendant fire a weapon in the house. Jorge also testified that defendant and Blanca would usually begin drinking on Friday afternoon and sometimes continue until Monday or Tuesday, and that defendant took medication for anxiety and depression.

On the second day of trial, a juror informed the sheriff that he had read an article about the case in a newspaper. The juror was brought into court and, when asked by the court and defense counsel whether the article would affect his ability to be impartial about the case, the juror responded that it would not and that he still had an open mind. The juror also indicated that he mentioned the article to the other jurors, but that he did not discuss its contents with them. The court admonished the juror not to discuss the article and allowed him to remain on the jury.

The parties stipulated that Cynthia Donath, a forensic scientist, tested the swabs taken from defendant's face and determined they contained blood. The parties further stipulated that Leslie Rosier, a DNA analyst, tested one of the swabs and found it to contain DNA from defendant and one other person, who may or may not have been Blanca.

Mary Wong, a forensic scientist, testified that she analyzed the gunshot residue kit taken

from defendant's hands and determined that he either had fired a gun or was in the vicinity of a discharged firearm.

Detective Daniel O'Shea testified that he interviewed defendant at the Elgin city jail at 9:15 a.m. on the date of the incident. Sergeant Jose Morales was also present for the interview and acted as a Spanish interpreter. Defendant initially told Detective O'Shea that he came home from work on the evening of Saturday, February 9, 2002. He and Blanca drank beer, and then she told him that she "had another man." They drank more beer, then defendant went to his auto repair shop and retrieved a gun. He returned home, "at some point" became angry about what Blanca said, and, according to defendant, "then she was shot."

Detective O'Shea told defendant that his statement was too vague, and defendant further explained that the gun had been in his jacket pocket and that Blanca was accidentally shot when he was taking the jacket off. When Detective O'Shea again asked defendant to be more specific, defendant explained that he became upset after Blanca told him about the other man, but that he and Blanca were not screaming at each other or physically fighting. Defendant stated that he went to his auto repair shop because that is where he often went when he was sad or depressed. Defendant smoked cigarettes and listened to music while at the shop, and then placed a .357 revolver in his jacket pocket and went home. Upon arriving there, defendant and Blanca drank more beer, danced, and listened to music. Blanca went to a downstairs bedroom and lay down in a bed, and defendant went downstairs to talk to her. Defendant told Detective O'Shea that he was taking his jacket off when the gun fired and Blanca was shot.

Detective O'Shea and Sergeant Morales interviewed defendant again at approximately

6

noon that day, during which time defendant gave a similar statement regarding the shooting. He added, however, that when he went downstairs to speak to Blanca, he was sitting behind her on the bed and she was on her right side facing away from him. Defendant stated that he was upset, but that he and Blanca were not arguing. When Blanca indicated that she did not want to talk to him, defendant reverted to an "instinct" he learned as a *Federale*, or policeman, in Mexico. Defendant explained that, as a *Federale*, when you feel threatened or that someone is going to hurt you, "you pull out a gun and shoot them before they can harm you." Defendant also added that he pulled the gun from his jacket pocket, extended his arm toward Blanca, and pulled the trigger. Defendant stated that he did not think he aimed the gun at her head and that the weapon was approximately 5 to 10 inches from Blanca's head when he pulled the trigger.

On cross-examination, Detective O'Shea testified that defendant told him that he had four to five beers before he left for his repair shop, and four to five more when he returned home. When Detective O'Shea asked defendant about the bullet hole in the bedroom, defendant responded that he had previously shot a gun in the house but that he did not shoot it at Blanca.

On Friday, September 26, 2003, the court informed the parties that a juror had communicated to the sheriff that she could not serve on the jury past the following Monday because her son had fractured his wrist. The State indicated that it would rest early that Monday, and defense counsel told the court that the only witness the defense might call was defendant. The court informed the jurors that there was a "strong possibility" that they would have the case on Monday.

Sergeant Jose Morales testified that he spoke to defendant at the scene of the shooting.

7

Defendant was able to respond to the officer's questions and did not slur his speech. Sergeant Morales also testified to the statements that defendant made during his interview with Detective O'Shea. Sergeant Morales added that defendant said he remained in the kitchen smoking cigarettes for approximately one-half hour after Blanca went downstairs, that he took medication for anxiety, depression, and diabetes, and that he was mad and angry at Blanca when he returned from his shop.

Elgin Officer Ramon Lazcano testified that he acted as a Spanish interpreter when Assistant State's Attorney (ASA) Shari Chandra met with defendant at approximately 7 p.m. on the day of the incident. During that interview, defendant stated that Blanca kept bringing up the fact that she had found someone else, that this made him "angry and frustrated," and that when he went downstairs and asked Blanca "why," she responded "just because." After Blanca made that statement, defendant pulled the gun out of his pocket, pointed it directly at Blanca's head, and pulled the trigger. Defendant threw the gun on the floor, checked Blanca's vital signs, and called 911. Officer Lazcano further testified that he acted as a translator when defendant gave a videotaped statement at approximately 9:30 that evening.

Defendant's videotaped statement was published to the jury. In that statement, defendant related that he came home from work at approximately 5:30 p.m. on Saturday, February 9, 2002. He and Blanca ate, drank beer, then danced and listened to music. While defendant and Blanca were dancing, she told him that she "had someone else." Defendant became upset and left for his auto repair shop at approximately midnight. He remained at the shop for about one-half hour listening to music and smoking cigarettes. Defendant then loaded a gun, placed it in his jacket

8

pocket, and went home. He entered the downstairs bedroom where Blanca was lying on a bed and confronted her about the other man. Blanca told defendant that the other man "was younger" and "had more to offer." Defendant went back to the kitchen, smoked more cigarettes and drank more beer, then returned to the downstairs bedroom where Blanca was lying on the bed. Defendant asked Blanca about the other man, and Blanca replied that "he was younger and could offer more than [defendant] did." Defendant asked Blanca "why," and she responded "because." When Blanca then turned away from him, defendant pulled the gun out of his pocket, put it to Blanca's head, and pulled the trigger. Defendant stated that he did not intend to kill Blanca.

The State rested following the publication of defendant's videotaped statement, and the defense rested without calling any witnesses. At the jury instruction conference that followed, defendant asked the court to instruct the jury on second degree murder and involuntary manslaughter. The court denied defendant's request for a second degree murder instruction, stating that the shooting was "anything but sudden and intense according to the evidence," but allowed the instruction for involuntary manslaughter. The court also submitted an instruction informing the jury that they were to consider the other crimes evidence only on the issues of defendant's intent, motive, or absence of mistake. See Illinois Pattern Jury Instructions, Criminal, No. 3.14 (4th ed. 2000) (hereinafter IPI Criminal 4th No. 3.14). Neither defendant nor the State objected to the instruction.

The jury retired at 5:03 p.m. and returned with a verdict sometime that evening. The jury found defendant guilty of first degree murder and that the State had proven that, during the commission of that offense, defendant personally discharged a firearm that proximately caused

1-05-1354

Blanca's death. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2002). The trial court subsequently sentenced defendant to 75 years' imprisonment, 50 years for first degree murder and 25 years for personally discharging a firearm. This appeal followed.

Defendant first claims that counsel acted unreasonably by failing to move to replace the juror who informed the court that she could not serve on the jury past a specific date. The record shows that on the third day of trial, Friday, September 26, 2003, a juror informed the court that she "did not think" she could serve on the jury past the following Monday because her son had fractured his wrist. The State told the court that it would rest its case on Monday, and defense counsel indicated that the only witness the defense might call was defendant. The court then determined that it was "fairly certain" the case would be given to the jury by Monday and that the juror did not pose a problem.

Defendant asserts that counsel's failure to move to replace the juror or question her about the nature of her obligations denied him a fair trial because it allowed the juror to enter deliberations under the external pressure to reach a guilty verdict. Under these circumstances, defendant argues, there can be no confidence in the jury's decision and the case should therefore be remanded for a new trial.

Claims of ineffective assistance of counsel are reviewed under the two-pronged test announced in Strickland v. Washington, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). People v. Bloomingburg, 346 Ill. App. 3d 308, 316-17 (2004). To prevail on a claim of ineffective assistance of counsel, defendant must show that (1) counsel's representation fell below an objective standard of reasonableness, and that (2) counsel's deficient

10

performance so prejudiced defendant as to deny him a fair trial. Strickland, 466 U.S. at 687, 80 L. Ed. 2d at 674, 104 S. Ct. at 2064. The failure to make the requisite showing of either deficient performance or sufficient prejudice defeats the claim. People v. Palmer, 162 Ill. 2d 465, 475 (1994).

With regard to the first prong, defendant must overcome the strong presumption that, under the circumstances, the challenged action or inaction of counsel was sound trial strategy. People v. Jones, 322 Ill. App. 3d 675, 678-79 (2001). Moreover, because effective assistance of counsel refers to competent, not perfect, representation (Palmer, 162 Ill. 2d at 476), matters relating to trial strategy are generally immune from claims of ineffective assistance of counsel (People v. West, 187 Ill. 2d 418, 432 (1999)). In determining the adequacy of counsel's representation, a reviewing court will not consider isolated instances of misconduct, but rather the totality of the circumstances. People v. Long, 208 Ill. App. 3d 627, 640 (1990).

To establish prejudice, defendant must show there is a reasonable probability that, but for counsel's errors, the result of the trial would have been different. People v. Johnson, 206 Ill. 2d 348, 362 (2002). If we can resolve defendant's claim on the issue of prejudice, we need not consider whether counsel's performance was deficient. People v. Smith, 326 Ill. App. 3d 831, 841 (2001).

We find that defendant has not shown that he was prejudiced by counsel's alleged errors because there is no evidence in the record to suggest that the juror was under any pressure to reach a verdict. We disagree with defendant that it is "possible to infer" that external pressure contributed to the verdict based on the fact that the jury did not retire until 5 p.m. on Monday and

reached a guilty verdict that same evening. There is nothing in the record to support this inference, and it just as likely that the evidence of defendant's guilt allowed the jury to reach a guilty verdict the same evening it began deliberations. Under these circumstances, we conclude that counsel's failure to move to replace the juror did not deny defendant a fair trial or result in a verdict unworthy of confidence.

We also find that defendant suffered no prejudice from counsel's alleged error in light of the overwhelming evidence of defendant's guilt. The evidence established that Blanca's death was caused by a single gunshot wound to the head and that the muzzle of the handgun was against her skin at the time it was fired. Blanca was found by the police lying on her side on a bed, partially under the covers and cradling a pillow. Defendant made a 911 call shortly after the murder stating that he had just shot his wife in the head. According to defendant's own statements to the police, he went downstairs to talk to Blanca, who was lying on a bed, and when she turned away from him, he pulled out a gun and shot her in the head. A .357 Magnum containing six rounds, one of which was spent, was found at the scene, and defendant's right hand tested positive for gunshot residue, indicating that he had fired a gun or was in the vicinity of a discharged firearm. Considering the overwhelming evidence of defendant's guilt, we find that the result of his trial would not have been different had the juror been removed or questioned further by the trial court.

Defendant relies upon People v. Friedman, 144 Ill. App. 3d 895, 903-04 (1986), and People v. Branch, 123 Ill. App. 3d 245, 251-52 (1984), where the trial court's comments were found to have impermissibly hastened the jury's verdict. However, these cases are factually

distinguishable from the instant case. In each case, the trial court made comments to the jury after it had begun deliberations regarding sequestration or the possibility of a deadlock (Friedman, 144 Ill. App. 3d at 903; Branch, 123 Ill. App. 3d at 250), and in Branch the court also singled out the one juror who would not vote guilty and stated, in open court, that the juror should not have served on the jury (Branch, 123 Ill. App. 3d at 250). Further, in each case the jury returned a verdict within ten minutes of hearing the trial court's comments. Friedman, 144 Ill. App. 3d at 903; Branch, 123 Ill. App. 3d at 252. Here, in contrast, the trial court made no comments that could have hastened the jury's verdict and, as previously noted, there is nothing in the record to suggest that the juror felt any pressure to reach a verdict.

Defendant next claims that counsel was ineffective for failing to strike two potential jurors who expressed an inability to be fair if the evidence showed that defendant drank alcohol and ingested prescription drugs prior to the shooting. Defendant's argument is based on the following colloquy which took place during *voir dire*:

> "MR. GUMP [Defense Counsel]: Would you be able to be fair and impartial in spite of [evidence that defendant drank excessively and ingested prescription medication prior to the incident in question]?
>
> MS. VAKARELLI [Potential Juror]: I'm not sure, I don't know.
>
> MR. GUMP: Is there any reason why that would affect you or how it would affect you?

MS. VAKARELLI: Because I know what the affects [*sic*] that drug and alcohol have on a person so I don't know how that would make a difference in this.

MR. GUMP: If there was that evidence brought in this case, could you still remain fair and impartial is the issue? Could you still judge him fairly and impartially even if there is some evidence of that?

MS. VAKARELLI: Most likely.

MR. GUMP: And how about you Mr. Stypinswi?

MR. STYPINSWI [Potential Juror]: I don't know. I have a buddy that is a recovered alcoholic so I don't know. I guess I could be. I don't know, it's a hard question.

\*\*\*

MR. GUMP: I just want to know whether or not you're going to be able to put aside your predisposition towards folks who are drinking or have drug problems in order to evaluate the evidence in a fair and impartial manner in this case?

MR. STYPINSWI: I can try to be."

Defense counsel did not challenge either juror, and both ultimately served on defendant's jury.

Defendant asserts that the jurors' responses signaled a predisposition to find against him, and that counsel was therefore unreasonable for failing to challenge the potential jurors for cause

14

or to use a peremptory challenge to strike them from the jury. Defendant maintains that counsel's failure to do so denied him a fair trial and resulted in a verdict unworthy of confidence. We disagree.

Defense counsel's conduct during *voir dire*, including the decision whether to exercise a peremptory challenge, involves matters of trial strategy that generally are immune from claims of ineffective assistance of counsel. People v. Metcalfe, 202 Ill. 2d 544, 562 (2002); People v. Bowman, 325 Ill. App. 3d 411, 428 (2001). In this case, defense counsel actively participated in *voir dire*, challenged two potential jurors for cause, and exercised four peremptory challenges to dismiss jurors who were members of the same panel as Vakarelli and Stypinswi. Additionally, after reviewing the jurors' responses, we believe it is just as likely that defense counsel concluded that any bias the jurors expressed might be directed against the State and not defendant. Defendant has presented no evidence to rebut the presumption that counsel's decisions were the result of trial strategy, and, on the record before us, we find that counsel's decision to accept Vakarelli and Stypinswi was a matter of trial strategy. Metcalfe, 202 Ill. 2d at 562.

Additionally, defendant has failed to show that he was prejudiced by counsel's decision not to challenge jurors Vakarelli and Stypinswi. The evidence against defendant was overwhelming, and we cannot say that the result of defendant's trial would have been different had Vakarelli and Stypinswi not served on the jury. Metcalfe, 202 Ill. 2d at 562-63.

We disagree with defendant's conclusion that the instant case is similar to People v. Johnson, 215 Ill. App. 3d 713 (1991), and People v. Stone, 61 Ill. App. 3d 654 (1978). Both

cases involved a claim that the trial court abused its discretion by denying counsel's challenge of potential jurors for cause, and neither case involved an ineffective assistance of counsel claim or the accompanying presumption that counsel's conduct during *voir dire* is a matter of trial strategy. Johnson, 215 Ill. App. 3d at 723; Stone, 61 Ill. App. 3d at 663. In Johnson, three jurors equivocated when asked whether they could be fair and impartial, and each testified that either he or his family or friends had been victims of violent crimes. Johnson, 215 Ill. App. 3d at 724. In Stone, the potential jurors gave answers during voir dire that demonstrated a clear and strong bias against the defendant. Stone, 61 Ill. App. 3d at 663-66. Here, on the other hand, the potential jurors did not give statements during *voir dire* demonstrating a bias against defendant and, as noted, gave responses that defense counsel could have reasonably interpreted as demonstrating sympathy for defendant. Accordingly, these cases provide no basis for granting defendant a new trial.

Defendant finally claims that counsel was ineffective for failing to investigate the extent of a juror's communications with the rest of the jury regarding an article the juror read about the case during trial. The record shows that, on the second day of trial, a juror informed the sheriff that he had read an article about the case in a newspaper. The juror was brought into open court, and the following colloquy took place:

> "THE COURT: Okay. Well, let me ask you this. *** [W]hat
> I need to know from you is would this affect your ability to be fair
> and impartial having read this *** article in the paper?
>
> MR. WADE [Juror]: Right now it would not. I still have an

16

open mind.

THE COURT: All right. And did you mention this to anybody else in the jury room?

MR. WADE: I just walked in there and mentioned that I had read the article.

THE COURT: Okay. But you didn't discuss the article at all?

MR. WADE: No. No.

MR. GUMP [Defense Counsel]: Did you – did you actually read the article?

MR. WADE: Yes, I did.

\*\*\*

MR. GUMP: Oh, okay. And you didn't talk about it to any of the other jurors?

MR. WADE: No, sir.

THE COURT: When you mentioned that you read the article, did anybody say oh, yeah, I saw that article?

MR. WADE: No, no one else did.

MR GUMP: Did you hear any radio reports about it or T.V.?

MR. WADE: No, none whatsoever.

MR GUMP: And that's all you saw or read just what was –

MR. WADE: Right the article in the Tribune this morning.

17

It was also in the Elk Grove Herald.

MR GUMP: Oh, right. Are you going to be able to put that aside when you're sitting on judgment in this case?

MR. WADE: Yes, I would, yes.

MR GUMP: And you could continue to give Mr. Lopez a fair and impartial –

MR. WADE: Very definitely.

MR GUMP: Okay. And keep an open mind –

MR. WADE: Right."

Defendant points to Wade's response that he could be fair "right now" as indicating that the article may have had some influence on his perspective, and to Wade's statement that he mentioned the article to the rest of the jury. Under these circumstances, defendant asserts, counsel should have taken three "simple steps" to protect his right to an impartial jury.

First, defendant claims that counsel should have determined the specific contents of the article instead of taking Wade's word that he could remain impartial after having read the article. However, even if we agree that counsel should have done so, defendant has not shown that he was prejudiced by counsel's omission. The record demonstrates that the trial court safeguarded defendant's right to a fair trial by thoroughly examining Wade as to any possible prejudice resulting from having read the article. See People v. Hicks, 134 Ill. App. 3d 1031, 1034 (1985) (trial court's examination and admonishment of juror who heard a radio broadcast about other charges against defendant safeguarded defendant's right to a fair trial). Wade's responses to the

18

court's examination were unequivocal and clearly demonstrated an ability to put the article aside and continue to give defendant a fair trial, and defendant has pointed to no evidence suggesting that Wade was prejudiced against him by having read the article. We therefore find that counsel's failure to ascertain the article's contents did not deny defendant a fair trial or constitute ineffective assistance.

Second, defendant claims that counsel should have asked the court to inquire of the other jurors about their knowledge of the article and whether it would affect their ability to be fair. However, defendant cannot show that he was prejudiced by counsel's failure to make that request because nothing in the record indicates that the other jurors had read the article or that they were prejudiced by its contents. Rather, the record shows that, in response to questions by defense counsel and the court, Wade stated that he had not discussed the article's contents with the other jurors and that none of the other jurors indicated they had seen the article when Wade mentioned having read it. Under these circumstances, we cannot say that counsel was ineffective for failing to ask the court to question the jurors about the article.

Third, defendant claims that counsel was ineffective for failing to request additional admonishments to inform the jury it was not to consider anything it might have read about the case in the newspaper. We disagree. The record establishes that only one juror read an article about the case, that the juror did not discuss that article with any other jurors, and that the court admonished that juror not to discuss the article. The court again instructed the jury at the close of evidence that day not to discuss the case and to refrain from any newspaper articles or radio reports about the case. Moreover, at the end of trial, the court instructed the jury that the only

evidence it could consider was the testimony of the witnesses and the exhibits received by the court. There is a strong presumption that jurors follow the instructions given by the court (People v. Harris, 288 Ill. App. 3d 597, 605 (1997)), and nothing in the record rebuts that presumption. Accordingly, defendant has not shown that the result of the trial would have been different had counsel requested additional admonishments. Johnson, 206 Ill. 2d at 362.

Defendant next contends that the trial court erred when it failed to instruct the jury on second degree murder based on provocation resulting from mutual combat. Defendant claims that the instruction was warranted because there was evidence in the record that, if believed by the jury, showed that the shooting occurred when defendant acted under sudden and intense passion stemming from serious provocation.

The decision to issue a jury instruction is within the discretion of the trial court, and a reviewing court will not reverse that decision absent an abuse of that discretion. People v. Woodard, 367 Ill. App. 3d 304, 315 (2006). An instruction on second degree murder based on serious provocation should be given only when there is some evidence of serious provocation in the record that, if believed by the jury, would reduce the crime to second degree murder. People v. Jackson, 304 Ill. App. 3d 883, 893 (1999).

A person commits second degree murder when he commits first degree murder while acting either under a sudden and intense passion resulting from serious provocation by the victim, or under the belief that the circumstances surrounding the killing would justify or exonerate its commission. 720 ILCS 5/9-2(a)(1), (a)(2) (West 2002). Serious provocation is defined as "conduct sufficient to excite an intense passion in a reasonable person." 720 ILCS

20

5/9-2(b) (West 2002). The four categories of provocation that courts recognize as sufficient to warrant a second degree murder instruction are mutual quarrel or combat, substantial physical injury or assault, illegal arrest, and adultery with the offender's spouse. People v. Cook, 352 Ill. App. 3d 108, 129-30 (2004).

Defendant claims that sufficient evidence was presented that he and Blanca engaged in mutual quarrel or combat on the night of the incident to support a second degree murder instruction. Defendant contends that the instruction was warranted because Blanca "repeatedly informed [him] of her infidelity" on the night of the shooting, he and Blanca argued before and after defendant was at his auto repair shop, he received injuries to his face during the night, and Blanca sustained injuries to her hand. Defendant further asserts that his and Blanca's "severe intoxication" created a strong suggestion that Blanca's revelation of infidelity escalated into mutual combat.

Mutual combat is defined as " 'a fight or struggle which both parties enter willingly or where two persons, upon a sudden quarrel and in hot blood, mutually fight upon equal terms and where death results from the combat.' " People v. Thompson, 354 Ill. App. 3d 579, 588 (2004), quoting People v. Austin, 133 Ill. 2d 118, 125 (1989). Mutual combat will not be found where the manner in which the accused retaliates is out of all proportion to the provocation, particularly where the homicide is committed with a deadly weapon. Austin, 133 Ill. 2d at 127. One who instigates a quarrel cannot rely on the victim's response as evidence of mutual combat (People v. Delgado, 282 Ill. App. 3d 851, 859 (1996)), and there is no mutual combat if "sufficient time had lapsed between the alleged provocation and the homicide to permit the voice of reason to be

21

heard" (People v. Coleman, 124 Ill. App. 3d 285, 289 (1984)).

In this case, we find that the record contains no evidence of a "mutual quarrel" between defendant and Blanca that would warrant a second degree murder instruction. This was not a "mutual" struggle that Blanca entered "willingly." Austin, 133 Ill. 2d at 125. According to defendant's own statements, Blanca initially told him that she "had another man" when defendant returned home from work on the evening of February 9, 2002. Defendant then went to his auto repair shop and remained there for at least one-half hour smoking cigarettes and listening to music. Defendant then loaded a gun, returned home, drank beer, danced, and listened to music. Defendant went to the downstairs bedroom, confronted Blanca about the other man, then returned to the kitchen to smoke more cigarettes and drink more beer. Defendant then returned to the downstairs bedroom and again confronted Blanca about the other man. When Blanca turned away and would not speak to him, defendant pulled out a gun and shot her in the head.

The record reveals that defendant was the aggressor who initiated the quarrel and then responded disproportionately to the alleged provocation. Thus, defendant was not entitled to a second degree murder instruction. See Jackson, 304 Ill. App. 3d at 893-94 (defendant not entitled to provocation instruction where he instigated the combat and responded to being grabbed by stabbing the unarmed victim).

Defendant nevertheless contends that the instruction was warranted based on evidence that Blanca "repeatedly informed [him] of her infidelity" prior to the shooting. However, mere words are insufficient to constitute serious provocation. People v. White, 353 Ill. App. 3d 905, 915 (2004). Moreover, the record shows that defendant shot Blanca many hours after she

22

initially told him that she "had another man." We believe there was sufficient time "to permit the voice of reason to be heard" (Coleman, 124 Ill. App. 3d at 289) and to therefore negate defendant's argument that he was acting under a "sudden and intense passion" based on Blanca's revelations. See People v. Harris, 154 Ill. App. 3d 308, 318 (1987) (finding that defendant was not acting under a sudden and intense passion resulting from mutual combat where, after a shoving match, defendant left the victim, saw him on the street approximately 15 minutes later, and shot him to death).

Defendant also claims that the instruction was warranted based on evidence that he and Blanca argued, fought, and were intoxicated on the night of the shooting. Defendant's claim is contradicted by his own statements to police that he and Blanca did not fight or argue during the incident. Moreover, this was not a fight on equal terms, as the record shows that defendant was armed with a .357 revolver, while Blanca was unarmed and lying under the covers in bed, cradling a pillow. Therefore, even if defendant's allegations of fighting and intoxication were true, defendant's response of shooting Blanca was clearly not proportional. Austin, 133 Ill. 2d at 127; Jackson, 304 Ill. App. 3d at 893. Accordingly, the trial court did not abuse its discretion by refusing to give the jury a second degree murder instruction.

Defendant next contends that the trial court erred when it allowed the State to introduce other crimes evidence of unrelated bullet holes inside his house. Defendant claims that the evidence did not rebut his defense that the shooting was accidental and that it had no purpose other than to demonstrate his propensity to commit violence.

Generally, evidence of prior bad acts is not admissible to show a defendant's propensity

23

to commit crimes. People v. Kliner, 185 Ill. 2d 81, 146 (1998). However, such evidence is admissible if it is relevant for any other purpose, such as to show intent, identity, *modus operandi*, motive, or absence of mistake. People v. Wilson, 214 Ill. 2d 127, 135-36 (2005). The admissibility of other crimes evidence is within the sound discretion of the trial court, and its ruling on the matter will not be reversed absent a clear abuse of that discretion. Wilson, 214 Ill. 2d at 136.

In this case, prior to trial, the State sought to introduce evidence showing that gunshots had been fired in defendant's home prior to the shooting of Blanca. Over defense counsel's objection, the trial court ruled that the evidence was admissible to show defendant's motive, intent, and absence of mistake. For purposes of this appeal, we need not decide whether the trial court's ruling to allow this evidence was error because, for the reasons that follow, we find that any such error was harmless.

Our supreme court has repeatedly held that the improper introduction of other-crimes evidence is harmless error when a defendant is neither prejudiced nor denied a fair trial based upon its admission. See, e.g., People v. Nieves, 193 Ill. 2d 513, 530 (2000); People v. Kliner, 185 Ill. 2d 81, 147 (1998). The record shows that Detective Bianchi testified that he photographed several bullet holes in various bedrooms in defendant's house. Under cross-examination, Detective O'Shea testified that he asked defendant about the "hole in the bedroom," and that defendant stated that he had previously shot a gun in the house but that he did not shoot it at Blanca. The record further reveals, however, that no other references were made to the bullet holes, including during opening and closing arguments. Therefore, any prejudicial effect

from these isolated references to the bullet holes was harmless because of the overwhelming evidence of defendant's guilt. See Nieves, 193 Ill. 2d at 530-31 (finding that prejudicial effect from isolated reference to defendant's criminal activity in another state was overshadowed by the substantial evidence of defendant's guilt); People v. Daniels, 331 Ill. App. 3d 380, 390 (2002) (isolated references to defendant's lack of a gun permit found to be harmless in view of the overwhelming evidence of the defendant's guilt). Accordingly, defendant was not prejudiced by evidence of the bullet holes and any error in admitting evidence of them was harmless.

Defendant's final contention is that the trial court erred by failing to give the jury a limiting instruction at the time the other crimes evidence was admitted. Defendant further argues that the instruction that the trial court did ultimately submit to the jury was a misleading instruction.

The record shows that, prior to trial, the court ruled that Jorge Lopez could testify that defendant pointed a gun at Blanca on three occasions prior to the murder, and that Detective Bianchi could testify to bullet holes he found in defendant's house that were not created when Blanca was shot. The court told defense counsel that it would issue the appropriate limiting instruction to the jury at the end of trial, and specifically offered to also instruct the jury at the time the evidence was introduced. Despite the court's offer, defense counsel did not ask the court to orally instruct the jury when Jorge or Detective Bianchi testified. The record also shows that, following closing arguments, the court submitted a limiting instruction to the jury in accordance with IPI Criminal 4th No. 3.14 without objection from defendant. The instruction stated that:

1-05-1354

> Evidence will be received that the defendant has been involved in conduct other than that charged in the indictment.
>
> This evidence will be received on the issues of the defendant's intent, motive, or absence of mistake and may be considered by you only for that limited purpose.
>
> It is for you to determine whether the defendant was involved in that conduct and, if so, what weight should be given to this evidence on the issues of intent, motive or absence of mistake. IPI Criminal 4th No. 3.14.

The court also gave the jury the same instruction orally, substituting "evidence *has been* received" for "evidence *will be* received."

In his reply brief, defendant acknowledges that both of his claims ordinarily would be waived because he failed to ask the court to give the jury an oral instruction prior to admission of the other crimes evidence, failed to object to the written instruction that was ultimately given to the jury, and failed to raise either claim in his written posttrial motion. See People v. Enoch, 122 Ill. 2d 176, 186 (1988) (failure to raise objection at trial and include the objection in a posttrial motion results in waiver of that issue on appeal). However, defendant asks that we review both of these claims under the plain error doctrine.

Under the plain error doctrine, issues not properly preserved may be considered by a reviewing court under two limited circumstances: (1) where the evidence is closely balanced, so as to preclude argument that an innocent person was wrongfully convicted; or (2) where the

26

alleged error is so substantial that if affected the fundamental fairness of the proceeding and remedying the error is necessary to preserve the integrity of the judicial process. People v. Hall, 194 Ill. 2d 305, 335 (2000). Because we have already concluded that the evidence of defendant's guilt was overwhelming, we will only consider whether the alleged errors are of such magnitude that defendant was denied a fair trial and remedying the errors is necessary to preserve the integrity of the judicial process. Hall, 194 Ill. 2d at 335. For the reasons that follow, we find that they are not.

Defendant first claims that the trial court's failure to give the jury a limiting instruction at the time the other crimes evidence was introduced allowed that evidence to reach the jury "unfettered" and to shape the jury's perception of defendant until the written instruction was given. To support his argument, defendant relies on People v. Harris, 288 Ill. App. 3d 597 (1997).

In Harris, defendant claimed that trial counsel was ineffective for failing to request a limiting instruction for the jury in advance of the State's presentation of other crimes evidence. Harris, 288 Ill. App. 3d at 605. This court disagreed, noting that no case law required counsel to request such an instruction, that the other crimes instruction was ultimately given at the end of the case, and that there was a strong presumption that jurors follow the instructions of the court. Harris, 288 Ill. App. 3d at 605. In *dicta*, we "suggest[ed]" that trial judges heed the advice contained in People v. Denny, 241 Ill. App. 3d 345, 360-61 (1993), that " 'trial courts should not only instruct the jury in accordance with IPI Criminal [3d] No. 3.14 at the close of the case, but also orally from the bench (unless defendant objects) at the time the evidence is first presented to

27

the jury.' " <u>Harris</u>, 288 Ill. App. 3d at 606.

While we do not disagree with our suggestion in <u>Harris</u>, the trial court in this case did offer to give the jury a limiting instruction at the time the other crimes evidence was introduced. Defendant, however, did not ask the court to do so. Moreover, as in <u>Harris</u>, the jury was ultimately given both an oral and written limiting instruction after the close of evidence, and nothing in the record rebuts the presumption that the jury followed that instruction. <u>Harris</u>, 288 Ill. App. 3d at 606; see also <u>People v. Heard</u>, 187 Ill. 2d 36, 61 (1999) (finding that trial court's failure to give limiting instruction to the jury at the time other crimes evidence was introduced did not mandate reversal where the court properly instructed the jury after closing arguments in accordance with IPI Criminal 4th No. 3.14). Finally, any error by the court in failing to orally instruct the jury would be harmless in light of the overwhelming evidence of defendant's guilt. See <u>People v. Jackson</u>, 357 Ill. App. 3d 313, 321-22 (2005) (finding trial court's failure to give a limiting instruction to the jury regarding other crimes evidence harmless where the evidence of defendant's guilt was not closely balanced). Accordingly, we find that the trial court's failure to give the jury a limiting instruction when the other crimes evidence was introduced does not rise to the level of plain error.

Defendant also claims that the limiting instruction the court provided to the jury after closing arguments was ineffective and did not cure the prejudicial nature of the other crimes evidence. Defendant asserts that, because the instruction never specified to what "conduct" it referred, the jury could have believed that the instruction referred to other "uncharged conduct" that he was involved in, such as carrying a gun in his car and driving while intoxicated.

Defendant further claims that the written instruction was "meaningless" and insufficient because it substituted "evidence *will be* received" for "evidence *has been* received."

We find no error in the instruction given by the trial court. Defendant has pointed to no case law, nor are we aware of any, that requires the limiting instruction to specify the precise conduct to which it referred. The committee notes accompanying IPI Criminal 4th No. 3.14 also make no mention or recommendation of the limiting instruction stating the specific conduct to which it applies. See IPI Criminal 4th No. 3.14, Committee Comments. Moreover, Supreme Court Rule 451(a) provides that when Illinois Pattern Jury Instructions contain an applicable instruction, it "shall be used, unless the court determines that it does not accurately state the law." 210 Ill. 2d R. 451(a). In this case, following closing arguments, the trial court gave the jury an oral limiting instruction that precisely matched the language of IPI Criminal 4th No. 3.14, and submitted a written instruction that did the same while using "*will be* received" instead of "*has been* received." We find that these instructions properly instructed the jury that the other crimes evidence could only be considered for the limited purpose of showing defendant's motive, intent, and absence of mistake. See Heard, 187 Ill. 2d at 61 (trial court's use of IPI Criminal 3d No. 3.14 informed the jury of the limited purpose for which it could consider the other crimes evidence). There was no plain error in this case.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Affirmed.

GARCIA and R. GORDON, JJ., concur.

29

1-05-1354