THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. SPYRIDON C. BOTSIS, Defendant-Appellant.

First District (1st Division)   No. 1—07—3118

Opinion filed February 2, 2009.—Rehearing denied March 4, 2009.

Jed Stone and John Curnyn, both of Stone & Associates, L.L.C., of Waukegan, for appellant.

Richard A. Devine, State's Attorney, of Chicago (James E. Fitzgerald and Janet C. Mahoney, Assistant State's Attorneys, of counsel), for the People.

JUSTICE WOLFSON delivered the opinion of the court:

At around 3:45 p.m. on January 30, 2005, defendant Spyridon Botsis was driving to work on Lake Cook Road when he lost consciousness. Defendant's car crossed from the westbound lane of traffic into the eastbound lane and hit several other cars, killing Vanessa Grimes and injuring Sharon Tracy.

Following a jury trial, defendant was convicted of aggravated reckless driving and reckless homicide. He was sentenced to a three-year prison term for reckless homicide and a concurrent one-year prison term for aggravated reckless driving. On appeal, defendant contends: (1) the State failed to prove him guilty beyond a reasonable doubt; (2) the trial court erred in denying two critical pretrial motions; (3) the State committed several discovery violations; (4) the trial court erred by refusing to give paragraph 2 of the jury instruction Illinois Pattern Jury Instructions, Criminal, No. 5.01B (4th ed. 2000); and (5) the trial court erred in allowing the State to present improper evidence to the jury. We affirm the convictions and sentences.

FACTS

At trial, Georgia Botsis, defendant's mother, testified she kept a file regarding defendant's medical condition. Botsis testified defendant had at least three prior fainting incidents: On June 6, 1999, and November 15, 2003, defendant fainted while he was using the bathroom; on May 22, 2004, defendant fainted while driving his car, which resulted in a minor crash when defendant rear-ended the car in front of him. After each of the three fainting episodes, defendant and his family sought medical advice to determine a diagnosis and treatment.

Botsis testified that following the June 1999 incident, defendant went to the emergency room. Defendant was 17 at the time. Several tests were run; each came back normal. When defendant was released, he went to see his pediatrician, Dr. Stein.

Following the November 2003 incident, defendant was taken to the hospital by ambulance. Defendant was prescribed medication and instructed not to operate any equipment that could be dangerous should another "seizure" occur. Botsis contacted Dr. Voula Asimaco-poulos.

Dr. Asimacopoulos testified she went to the hospital on November 15, 2003, and referred defendant to a specialist, Dr. Levy. Dr. Asimaco-poulos told defendant not to drive until he had a diagnosis and was treated.

Botsis testified defendant went to see Dr. Levy on November 24, 2003. Defendant told Botsis that Dr. Levy instructed him not to drive for one month. After a follow-up visit one month later, defendant told Botsis that Dr. Levy said he could drive.

Dr. Barry Levy, a neurologist, testified he saw defendant in his of-fice on November 24, 2003. His tentative diagnosis was a seizure or fainting spell. Dr. Levy recommended defendant not drive for a "minimum of six months without recurrence of episodes." Dr. Levy said he never told defendant he could drive again after one month. While Dr. Levy routinely encouraged follow-up visits before a patient drove again, he "didn't feel it was mandatory in this situation."

On May 22, 2004, defendant was involved in a minor traffic crash after he lost consciousness and drove into the back of a car. After the crash, defendant was treated by Dr. John Vozenilek, an emergency room physician at Glenbrook Hospital. After a physical exam revealed tongue lacerations, Dr. Vozenilek concluded defendant had a seizure. In his discharge papers defendant was instructed not to drive. Defendant signed the instruction.

Georgia Botsis testified defendant went back to Dr. Levy after the May 22 crash. According to Botsis, Dr. Levy prescribed Dilantin for defendant. Botsis said defendant took it for a week and then stopped because it made him feel terrible and his tests came back negative. Botsis believed defendant had spoken to Dr. Levy about not taking the medication. Botsis said she and Dr. Asimacopoulos agreed to wean defendant off the Dilantin.

Dr. Levy testified defendant returned to his office on May 25, 2004. When asked to describe his symptoms, defendant said he "sud-denly lost consciousness" and his next recollection was with the paramedics. Dr. Levy diagnosed a seizure disorder and prescribed Di-lantin. Dr. Levy testified he told defendant "not to drive" for a "[b]are

minimum of six months with no episodes" but to "be determined as things went along." Dr. Levy told defendant "we would need to discuss clearance to drive at a future point." Defendant was not told he could just wait six months and then drive. Dr. Levy said defendant never contacted him regarding a request to change or stop taking his medication. Defendant was scheduled for an appointment on July 7, 2004; it was canceled. Dr. Levy did not see defendant again after the May 25 appointment. Dr. Levy never gave defendant permission to resume driving.

Dr. Asimacopoulos testified that sometime after May 22, 2004, defendant called her to talk about a conversation he had with Dr. Levy. Defendant told Dr. Asimacopoulos that Dr. Levy said he should stay on Dilantin and even increase the dose, even though his tests were normal. Defendant complained about the dosage and how it made him feel. Dr. Asimacopoulos said she never told defendant he should not take Dilantin and never assisted him in weaning off the medication. After defendant said he wanted a second opinion, Dr. Asimacopoulos recommended Dr. Rosenbaum, a cardiologist. Dr. Asimacopoulos testified she never told defendant directly or indirectly that he could drive.

Dr. Richard Rosenbaum testified he met with defendant on July 9, 2004. Defendant told Dr. Rosenbaum about his prior fainting episodes. When asked what happened on May 22, defendant told Dr. Rosenbaum he was fatigued and running late to work when he had a seizure or lost consciousness, which resulted in hitting a car. Defendant explained it was a hot day and he did not have air conditioning in his car. Defendant told Dr. Rosenbaum he had been prescribed Dilantin but was no longer taking it. It was Dr. Rosenbaum's understanding that defendant had been the one to decide to discontinue his medication. Dr. Rosenbaum testified defendant's recollection of his office visit with Dr. Levy "sounded as though Doctor Levy had given him instructions not to drive." Dr. Rosenbaum said defendant told him he had begun driving again approximately two weeks before his July 9 visit.

Dr. Rosenbaum made a differential diagnosis of neurocardiogenic syncope, the common faint. Dr. Rosenbaum said defendant could not anticipate when he would lose consciousness. Dr. Rosenbaum believed:

> "[Defendant] represented to me among the most high risk patients with neurocardiogenic syncope because I'm worried they won't have any warning. And he's already proven himself to have syncope while seated behind the wheel of a car."

When asked "what did you tell [defendant] specifically about driving," Dr. Rosenbaum said "I told him specifically he should not drive." Dr. Rosenbaum performed a "tilt table test" to study defendant's heart

rate and blood pressure. The results were normal, which did not rule out syncope.

During the July 16 office visit, Dr. Rosenbaum prescribed defendant florniff, a steroid-like compound used to treat neurocardiogenic syncope. Dr. Rosenbaum instructed defendant "to refrain from driving a motor vehicle." Dr. Rosenbaum "didn't give him any specific time where he would be able to reinitiate driving privileges." Although defendant was scheduled for a follow-up appointment, Dr. Rosenbaum did not see defendant again after July 16, 2004. Dr. Rosenbaum admitted he wrote a letter to Dr. Asimacopoulos indicating that defendant should not drive for three to six months, and that he was concerned about defendant driving because he did not have any warning signs before losing consciousness.

Georgia Botsis testified defendant stopped driving after the July 9 appointment and did not drive again until six months later.

Dr. Marc Dahman testified he was working in the emergency room at Lutheran General Hospital on January 30, 2005, when defendant was brought in for treatment after the collision that resulted in the charges in this case. When Dr. Dahman spoke to defendant about what happened, defendant said he had lost consciousness. Defendant told Dr. Dahman he had three past episodes where he lost consciousness. Dr. Dahman diagnosed defendant as having a syncopal episode.

David Saifuku, since retired, testified he was a Highland Park police officer on January 30, 2005, when he interviewed defendant in the emergency room. Defendant told Saifuku he was driving westbound on Lake Cook Road on his way to work when he crossed the center line. Defendant said a green Honda may have cut him off, but he could not recall all of the facts. Defendant said he started to black out at the start of the crash. When Saifuku spoke to Dr. Asimacopolouos at the hospital, she gave him the names of defendant's doctors—Dr. Levy and Dr. Rosenbaum.

The jury found defendant guilty of reckless homicide (death of Vanessa Grimes) and aggravated reckless driving (injuries to Sharon Tracy). He was sentenced to a three-year prison term for reckless homicide and a concurrent one-year prison term for aggravated reckless driving. Defendant appeals.

## DECISION

### I. Sufficiency of the Evidence

Defendant contends the State failed to prove him guilty beyond a reasonable doubt of reckless homicide and aggravated reckless driving. Specifically, defendant contends the State did not prove he had a culpable mental state.

Defendant's reasonable doubt argument concentrates on the reckless homicide conviction, with only a passing mention of the aggravated reckless driving charge. However, the bottom line issue in both counts of the indictment is the same: was defendant acting recklessly when his car struck the cars in which Vanessa Grimes and Sharon Tracy were riding?

The relevant question is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the defendant guilty beyond a reasonable doubt. *People v. Cunningham*, 212 Ill. 2d 274, 278, 818 N.E.2d 304 (2004); *People v. Ornelas*, 295 Ill. App. 3d 1037, 1049, 693 N.E.2d 1247 (1998). It is the responsibility of the trier of fact to determine the credibility of witnesses and the weight to be given their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence. *People v. Williams*, 193 Ill. 2d 306, 338, 739 N.E.2d 455 (2000). A criminal conviction will not be reversed unless the evidence is so improbable or unsatisfactory that a reasonable doubt of defendant's guilt is justified. *People v. Moore*, 171 Ill. 2d 74, 94, 662 N.E.2d 1215 (1996).

A defendant is guilty of reckless homicide when the State proves beyond a reasonable doubt that: (1) the defendant was operating a motor vehicle; (2) the defendant unintentionally caused a death while operating the vehicle; and (3) the acts which caused the death were performed recklessly so as to create a likelihood of death or great bodily harm to some person. See 720 ILCS 5/9—3(a) (West 2006); *People v. Wilson*, 143 Ill. 2d 236, 245, 572 N.E.2d 937 (1991).

Illinois's reckless homicide statute does not require that a defendant must deliberately intend to kill a human being. *Wilson*, 143 Ill. 2d at 246. "If a person 'unintentionally kills,' even in the performance of a 'lawful' act while conducting himself 'recklessly,' he commits the crime of reckless homicide." *Wilson*, 143 Ill. 2d at 246. Section 4—6 of the Criminal Code of 1961 defines "recklessness" as follows:

> "A person is reckless or acts recklessly, when he consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and such disregard constitutes a gross deviation from the standard of care which a reasonable person would exercise in the situation." 720 ILCS 5/4—6 (West 2006).

Recklessness, as it applies to a reckless homicide prosecution, may be inferred from all of the facts and circumstances in the record viewed as a whole and may be established by the defendant's physical condition. *People v. Solis*, 275 Ill. App. 3d 346, 355, 655 N.E.2d 954 (1995).

In *Wilson*, the defendant was convicted of reckless homicide after the car he was driving crossed the center line on a six-lane highway and collided with an oncoming vehicle, killing a passenger in the defendant's car. Our supreme court concluded the evidence was sufficient to support a finding that the defendant acted recklessly. Dr. Yeh, the doctor who diagnosed Wilson's sleep disorder, testified the defendant told him he had been suffering from excessive drowsiness problems for a number of years, and the problem had recently been exacerbated by the defendant's weight gain. Dr. Yeh also testified the defendant had informed him he had been falling asleep inappropriately for a number of years. The court found the evidence established the defendant was aware of his sleep disorder for years prior to the collision. *Wilson*, 143 Ill. 2d at 247.

Our supreme court pointed to authority in this state and in other jurisdictions to support a finding of criminal recklessness where a defendant chooses to drive an automobile knowing he suffers from a condition that could cause him to fall asleep or lose consciousness at the wheel. See *People v. Shaffer*, 49 Ill. App. 3d 207, 212, 364 N.E.2d 109 (1977) (Recklessness was established where it was shown the defendant had fallen asleep while driving on numerous occasions and, therefore, was aware he suffered from a physical condition that made it hazardous for him to drive); *People v. Decina*, 2 N.Y.2d 133, 139-40, 138 N.E.2d 799, 804, 157 N.Y.S.2d 558, 565 (1956) ("[T]his defendant knew he was subject to epileptic attacks and seizures that might strike *at any time*. With this *knowledge*, and without anyone accompanying him, he deliberately took a chance by making a conscious choice of a course of action, in disregard of the consequences which he knew might follow from his conscious act, and which in this case did ensue" (emphasis in original)); *State v. Gooze*, 14 N.J. Super. 277, 289, 81 A.2d 811, 816 (1951) (Under a reckless homicide statute similar to the Illinois statute, the court held defendant acted recklessly when he caused a death after losing consciousness while driving, based on evidence the defendant knew he suffered from a condition that could subject him to blackouts at unpredictable times).

Our supreme court noted the rationale of these cases is that "a driver may be guilty of a crime in undertaking to drive when he knows he may black out or lose consciousness." *Wilson*, 143 Ill. 2d at 247. The court held Wilson chose to operate an automobile "with the knowledge that he suffered from a condition that made it dangerous for him to drive," supporting a finding of recklessness on that basis "without any evidence of drinking alcoholic beverages." *Wilson*, 143 Ill. 2d at 248-49. The court did say the evidence of recklessness was stronger because the evidence established alcohol consumption would

aggravate the defendant's condition and he voluntarily consumed alcohol prior to driving. *Wilson*, 143 Ill. 2d at 249.

■ Here, the evidence was sufficient to support a finding that defendant acted recklessly. The evidence established defendant knew he had had at least three prior fainting incidents, including an incident on May 22, 2004, that resulted in a minor crash. Dr. Levy, defendant's neurologist, recommended defendant not drive for a "minimum of six months without recurrence of episodes" after defendant's November 2003 incident. Then, following defendant's May 2004 crash, Dr. Levy instructed defendant "not to drive" for a "[b]are minimum of six months with no episodes" but to "be determined as things went along." Defendant was told he and Dr. Levy "would need to discuss clearance to drive at a future point." Dr. Levy never gave defendant permission to resume driving. The defendant had notice of the potential danger. An exact diagnosis was not required.

Dr. Rosenbaum diagnosed defendant with neurocardiogenic syncope, the common faint, on July 9, 2004. Dr. Rosenbaum told defendant he represented the "most high risk" patient with syncope because he had "already proven himself to have syncope while seated behind the wheel of a car." Dr. Rosenbaum specifically told defendant "he should not drive." Dr. Rosenbaum instructed defendant "to refrain from driving a motor vehicle."

Dr. Asimacopoulos, defendant's family physician, never told defendant directly or indirectly that he could resume driving.

Like the defendant in *Wilson*, Botsis chose to operate an automobile knowing he suffered from a physical condition that made it extremely dangerous for him to drive. Defendant's doctors testified defendant knew he could experience a blackout without warning while driving. Defendant was specifically instructed by several doctors after the May 22 crash to stop driving; he never received permission to resume driving. Defendant, however, chose to ignore his doctors' instructions and resume driving in conscious disregard of the substantial risks associated with his actions. Defendant's reckless conduct resulted in his loss of consciousness while behind the wheel of his car, causing a head-on collision that injured Sharon Tracy and killed Vanessa Grimes.

The evidence, taken as a whole, established defendant acted with a conscious disregard of a substantial risk that he would cause great bodily harm or death by driving. The evidence was sufficient to support convictions for reckless homicide and aggravated reckless driving. See *Wilson*, 143 Ill. 2d at 249.

## II. Pretrial Motions

### A. Motion to Suppress Statements

■ Defendant contends the trial court erred by not granting his pretrial motion to suppress statements made to Highland Park police officer David Saifuku while being treated in the emergency room following the crash. Specifically, defendant contends that as a result of being interrogated in the emergency room without being advised of his *Miranda* rights, his statements to Officer Saifuku should have been suppressed as involuntary. His written motion to suppress alleges only the failure to give defendant *Miranda* warnings.

The testimony at the motion to suppress hearing showed that following the January 30 crash, defendant was taken by ambulance to the emergency room at Lutheran General Hospital. During questioning at the hospital, defendant told Officer Saifuku he had had three prior fainting incidents. Defendant told him the names of his treating doctors.

David Saifuku testified he was employed as a Highland Park police officer on January 30, 2005, when he received an assignment to interview defendant regarding a crash. Defendant was in the emergency room, immobilized on a backboard with a cervical collar on. Defendant was in a room separated from other rooms by a sliding door or curtain. During the interview, several people came in and out of the room, including defendant's family and Dr. Asimacopoulos.

Saifuku introduced himself as a police officer and requested a blood and urine sample from defendant. Defendant voluntarily signed a release while a registered nurse was present. Saifuku proceeded to question defendant regarding the crash, without advising him of his *Miranda* rights. Defendant never told Saifuku he could not talk to him because he was in pain. Saifuku did not handcuff defendant or tell him he was under arrest.

Saifuku admitted defendant was restrained on a backboard with a strap across his chest and arms during the interview. A nurse pointed out that blood was coming out of the corners of defendant's mouth. Saifuku admitted he told the hospital staff, out of defendant's presence, he was there to get defendant's blood and urine samples with or without his consent. Although Saifuku knew a fatal crash had occurred prior to questioning defendant, he did not know whether defendant would be charged with reckless homicide.

Defendant testified he was restrained on a backboard during the questioning. His neck was collared and he had bands around his head, shoulders, and legs. When defendant asked Saifuku to release the strap across his head, Saifuku ignored the request. The nurses also

ignored his request to remove the strap. When asked whether he felt he could leave or terminate the questioning, defendant said no. Defendant was not told Saifuku was conducting a death investigation until after Saifuku had finished questioning him. Defendant admitted Saifuku asked for his consent to collect blood and urine samples.

The trial court denied defendant's motion to suppress, finding defendant was not in custody because Saifuku simply questioned defendant as he found him.

When reviewing a trial court's ruling on a motion to suppress, findings of fact and credibility determinations are accorded great deference and will not be reversed unless they are against the manifest weight of the evidence. *People v. Braggs*, 209 Ill. 2d 492, 505, 810 N.E.2d 472 (2003). The ultimate question posed by the legal challenge to the trial court's ruling is reviewed *de novo*, however. *People v. Nicholas*, 218 Ill. 2d 104, 116, 842 N.E.2d 674 (2005).

In *Miranda v. Arizona*, 384 U.S. 436, 444, 16 L. Ed. 2d 694, 706-07, 86 S. Ct. 1602, 1612 (1966), the United States Supreme Court held that prior to the start of an interrogation, a person being questioned by law enforcement officers must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed," as long as that person "has been taken into custody or otherwise deprived of his freedom of action in any significant way." "The finding of custody is essential, as the pre-interrogation warnings required by *Miranda* are intended to assure that any inculpatory statement made by a defendant is not simply the product of 'the compulsion inherent in custodial settings.' " *People v. Slater*, 228 Ill. 2d 137, 149-50, 886 N.E.2d 986 (2008), quoting *Yarborough v. Alvarado*, 541 U.S. 652, 661, 158 L. Ed. 2d 938, 949, 124 S. Ct. 2140, 2147 (2004).

The determination of whether a defendant is in custody involves two discrete inquiries: " ' "first, what were the circumstances surrounding the interrogation; and second, given those circumstances, would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave." ' " *Slater*, 228 Ill. 2d at 150, quoting *Braggs*, 209 Ill. 2d at 505-06, quoting *Thompson v. Keohane*, 516 U.S. 99, 112, 133 L. Ed. 2d 383, 394, 116 S. Ct. 457, 465 (1995). We therefore examine "the objective circumstances of the interrogation." *Stansbury v. California*, 511 U.S. 318, 319-23, 128 L. Ed. 2d 293, 296-98, 114 S. Ct. 1526, 1527-29 (1994).

We find the circumstances surrounding the interrogation supported the trial court's finding that defendant was not "in custody" for *Miranda* purposes. While we recognize defendant was immobilized

on a backboard in the emergency room during questioning, he was placed in that position by medical personnel to facilitate his treatment, not by, or for, Officer Saifuku. Removing the strap would be a medical decision, not a law enforcement judgment. Defendant never was handcuffed, fingerprinted, or told he was under arrest. See *Slater*, 228 Ill. 2d at 156. Nor was defendant told he was not free to terminate the interview. In addition to the medical personnel who came in and out of defendant's room during questioning, Saifuku testified defendant's family was present at times.

This fact situation is not close to that in *People v. Dennis*, 373 Ill. App. 3d 30, 866 N.E.2d 1264 (2007), relied on by the defendant. There, the State agreed defendant was under arrest and in custody when he spoke to the police officer at the hospital. *Dennis*, 373 Ill. App. 3d at 46. Based on the record before us, we see no reason to reverse the trial court's decision to deny the motion to suppress. See *People v. Griffin*, 385 Ill. App. 3d 202, 212, 898 N.E.2d 704 (2008) ("we note that the parties in this case did not argue—and correctly so—that Wheeler's interview of defendant conducted at the hospital *** was a custodial interrogation. This may be because the coercive environment and restriction on defendant's freedom so important to a finding that she was in custody were totally absent in analyzing the circumstances surrounding [the] interview").

B. Medical Records

■ Defendant contends the trial court erred in allowing the introduction of his privileged medical records in violation of section 8—802 of the Code of Civil Procedure (Code) (735 ILCS 5/8—802) (West 2004)) and the federal Health Insurance Portability and Accountability Act of 1996 (HIPAA) (42 U.S.C. §1320d *et seq.* (2000)). The applicability of a statutory evidentiary privilege and its exceptions is reviewed *de novo*. *Kraima v. Ausman*, 365 Ill. App. 3d 530, 533, 850 N.E.2d 530 (2006).

Medical information disclosed between a physician and patient is protected by Illinois statute. The statute says:

"No physician or surgeon shall be permitted to disclose any information he or she may have acquired in attending any patient in a professional character, necessary to enable him or her professionally to serve the patient ***." 735 ILCS 5/8—802 (West 2004).

Two relevant exceptions exist: "(1) in trials for homicide when the disclosure relates directly to the fact or immediate circumstances of the homicide, *** [and] (4) in all actions brought by or against the patient *** wherein the patient's physical or mental condition is an issue." 735 ILCS 5/8—802(1)(4) (West 2004).

We find both of the listed privilege exceptions apply here. Under the homicide exception, the State is required to show the disclosure directly related to the immediate circumstances of the homicide. *People v. Sutton*, 316 Ill. App. 3d 874, 882, 739 N.E.2d 543 (2000). The homicide exception applies in reckless homicide cases. *Sutton*, 316 Ill. App. 3d at 883, citing *People v. Hart*, 194 Ill. App. 3d 997, 1003, 552 N.E.2d 1 (1990). Although the exception is commonly applied in cases involving intoxication, "any evidence which is probative of the issue of recklessness certainly relates directly to the immediate circumstances of the homicide." *People v. Bates*, 169 Ill. App. 3d 218, 225, 523 N.E.2d 675 (1988).

Defendant's history of lost consciousness was probative of his recklessness and the immediate circumstances of the homicide because he was unconscious when found at the scene. Defendant's medical history was admissible under the homicide exception.

The second listed exception applies because defendant's physical and mental condition is at issue. See *People v. Krause*, 273 Ill. App. 3d 59, 62, 651 N.E.2d 744 (1995) (exception applies in criminal cases). Defendant lost consciousness at some point before the crash. Because his physical and mental condition during the crash is relevant in determining the issue of recklessness, the privilege exception applied to defendant's disclosures to the paramedics on the scene, Dr. Dahman, and Saifuku, as well as to his related medical records. See *People v. Wilber*, 279 Ill. App. 3d 462, 468, 664 N.E.2d 711 (1996) (the defendant's disclosure regarding his alcohol intake was not protected because his mental and physical condition was at issue in the DUI case). See *People v. Popeck*, 385 Ill. App. 3d 806, 809-10 (2008).

Defendant also contends his medical records were illegally obtained in violation of HIPAA because he was not notified first.

HIPAA regulates the occasions when protected health information may be disclosed. *Giangiulio v. Ingalls Memorial Hospital*, 365 Ill. App. 3d 823, 839, 850 N.E.2d 823 (2006). Defendant relies on the wrong HIPAA exception, *i.e.*, judicial disclosure. The applicable exception is disclosure for law enforcement purposes, which does not require a patient's notice or consent. See *Gibson v. State*, 225 S.W.3d 824, 827 (Tex. App. 2007). The regulation says:

"A covered entity may disclose protected health information for a law enforcement purpose to a law enforcement official if the conditions in paragraphs (f)(1) through(f)(6) of this section are met, as applicable." 45 C.F.R. §164.512(f) (2007).

One of those conditions allows disclosure in compliance with a grand jury subpoena. 45 C.F.R. §164.512(f)(1)(ii)(B) (2007).

The parties dispute whether the subpoenas for defendant's medi-

cal records sent to Doctors Asimacopoulos, Levy, and Rosenbaum were issued by the grand jury. The subpoenas do not appear in the record. However, in his motion to bar the State's use of his medical records, defendant admits the State obtained them through a grand jury subpoena. At the hearing on the motion, the trial court referred to the subpoenas as "grand jury subpoenas." Defendant first contended the subpoenas were issued by the State's Attorney in his motion to reconsider the trial court's denial of the original motion. Defendant had the burden of presenting an adequate record for our review. *People v. Urdiales*, 225 Ill. 2d 354, 419, 871 N.E.2d 669 (2007). We resolve any doubts arising from the inadequate record against him. *Urdiales*, 225 Ill. 2d at 419. Based on the record here and defendant's admission, we find the disclosure of defendant's medical records was permitted under HIPAA.

III. Discovery Violations

A. Discharge Summary

■ Defendant contends the State failed to timely tender the discharge document Dr. Vozelinek said he gave to defendant following the May 22, 2004, crash. It was given to defense counsel just before Dr. Vozelinek's testimony. Defendant contends that violates Illinois Supreme Court Rule 412 (188 Ill. 2d R. 412) and *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963).

Supreme Court Rule 412 requires the State, upon motion of the defendant, to disclose certain material and information within the State's possession or control, including "any books, papers, documents, photographs or tangible objects which the prosecuting attorney intends to use in the hearing or trial." 188 Ill. 2d R. 412(a)(v).

A trial court's ruling on a discovery violation will not be disturbed absent an abuse of discretion. *People v. Matthews*, 299 Ill. App. 3d 914, 918, 702 N.E.2d 291 (1998). An abuse of discretion exists where the defendant is prejudiced by the discovery violation and the trial court fails to correct the prejudice. *Matthews*, 299 Ill. App. 3d at 918.

"[T]he purpose of the discovery rules is to protect the accused against surprise, unfairness, and inadequate preparation." *People v. Heard*, 187 Ill. 2d 36, 63, 821 N.E.2d 58 (1999). Although compliance with the rules is mandatory, failure to comply with the discovery rules does not require reversal absent a showing of prejudice. *Heard*, 187 Ill. 2d at 63, citing *People v. Robinson*, 157 Ill. 2d 68, 78, 623 N.E.2d 352 (1993). "The burden of showing surprise or prejudice rests on the defendant." *Heard*, 187 Ill. 2d at 63.

Immediately before Dr. Vozenilik's testimony in this case, the

State informed the court that while preparing Dr. Vozenilik to testify the previous day, he told the prosecution a discharge summary signed by defendant should have been included in defendant's medical records from Glenbrook Hospital. The State called the hospital and had it fax a copy of the discharge summary defendant signed. The State then tendered a copy of the document to defense counsel and explained the State had just received it. The document contained protocol instructions signed by defendant, instructing defendant in part that: "You must not drive. You definitely had a seizure." The assistant State's Attorney admitted to the court the document had not been tendered during discovery, saying: "I certainly didn't have it in my possession or control. And as soon as I got it, certainly within five minutes of getting it, I got it it [sic] to [defense counsel]."

Defense counsel objected, contending the document should be excluded because it was not disclosed until 15 minutes before Dr. Vozenilik's testimony. Defendant admitted he had received a separate document entitled "after visit summary, Spiro Bostsis" during discovery, which contained an identical instruction not to drive, unsigned by defendant.

The trial court overruled the objection, finding: "It's not trial by ambush. The State wasn't aware of it themselves." The trial court did not abuse its discretion in finding a discovery violation had not occurred.

Nor was the State's failure to produce the document until the day of Dr. Vozenilik's testimony a *Brady* violation. In *Brady*, the United States Supreme Court held the prosecution violates an accused's constitutional right to due process by failing to disclose evidence favorable to the accused and material to guilt or punishment. *People v. Beaman*, 229 Ill. 2d 56, 73, 890 N.E.2d 500 (2008), citing *Brady*, 373 U.S. at 87, 10 L. Ed. 2d at 218, 83 S. Ct. at 1196-97. The record here reflects the State did not fail to disclose the discharge summary document to defendant. As soon as the document came under the State's control, it tendered a copy of the document to defense counsel. When objecting to the document at trial, defense counsel specifically noted that he was not alleging the State "hid" the document during discovery. *Brady* does not apply.

## B. Saifuku's Disciplinary Records

Defendant contends the State violated defendant's right to a fair trial when it failed to disclose Officer Saifuku's criminal history and disciplinary records during discovery, in violation of *Brady* and Supreme Court Rule 412. Defendant contends the State's failure to disclose evidence of Saifuku's prior bad acts limited defendant's ability

to question Saifuku during the motion to suppress and at trial regarding his interest, bias, and motive to provide false testimony. Defendant also contends the trial court erred in limiting defense counsel's impeachment of Saifuku during cross-examination at trial.

A *Brady* claim requires a showing that evidence within the State's control was undisclosed and "the accused was prejudiced because the evidence is material to guilt or punishment." *Beaman*, 229 Ill. 2d at 73-74. Evidence is considered "material" if there is a reasonable probability the result of the proceeding would have been different had the evidence been disclosed. *Beaman*, 229 Ill. 2d at 74, citing *People v. Harris*, 206 Ill. 2d 293, 311, 794 N.E.2d 181 (2002). "To establish materiality, an accused must show 'the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.' " *Beaman*, 229 Ill. 2d at 74, quoting *People v. Coleman*, 183 Ill. 2d 366, 393, 701 N.E.2d 1063 (1998).

■ Here, the undisclosed evidence consisted of Saifuku's City of Highland Park Police Department disciplinary record and misdemeanor criminal history in Wisconsin. Defendant was aware before jury selection that Saifuku had been charged with two felonies and had pled guilty to misdemeanor battery and disorderly conduct in Wisconsin. Defense counsel discovered after Saifuku's testimony at the suppression hearing that the Wisconsin charge was the basis of one of two counts of disciplinary action against Saifuku by the Highland Park police department. Defendant alleged the other count of disciplinary action pending against Saifuku before his resignation stemmed from his failure to issue a ticket to an unlicensed driver who was involved in a property damage accident.

Before Saifuku's trial testimony, defendant filed a motion for mistrial or, alternatively, to bar Saifuku's testimony. Defendant claimed disclosure of the evidence of Saifuku's prior bad acts would have allowed him to impeach Saifuku's testimony during the motion to suppress hearing by showing Saifuku had an interest, bias, and motive to provide false testimony.

During a hearing on defendant's mistrial motion, the trial court questioned Highland Park police department Commander George Pfutzenruefer regarding Saifuku's disciplinary record. Commander Pfutzenruefer testified that although Saifuku was under investigation for failing to ticket an unlicensed motorist, no disciplinary action was initiated against Saifuku. He testified the personnel file would only contain matters of either disciplinary action or commendatory actions. He was not aware of any paperwork regarding the investigation. He said the investigation was terminated after Saifuku resigned from the department.

The trial court also questioned Saifuku regarding his plea agreement in the Wisconsin case, out of the presence of the jury. Saifuku said there was no discussion or agreement reached with either the Cook County or Lake County State's Attorney's office regarding his testimony in defendant's case prior to his plea in Wisconsin. Saifuku admitted a disciplinary action was pending against him for his failure to write a ticket for an unlicensed motorist when he resigned from the department. Saifuku said his decision to resign had nothing to do with defendant's case. Saifuku said no promises of future employment or recommendations of future employment were made in exchange for his testimony.

The trial court denied defendant's motion for mistrial and allowed Saifuku to testify.

Evidence of Saifuku's prior bad acts was of little relevance. There is no reasonable probability the result of the suppression proceedings would have been different had the evidence been disclosed. The lack of prejudice to defendant's case also renders harmless any alleged discovery violation under Supreme Court Rule 412.

Saifuku's credibility was not a serious issue in this case. Defendant never contended his statements to Saifuku were coerced. Nor has defendant suggested Saifuku testified falsely regarding the content of defendant's statements. Instead, defendant has simply challenged the voluntariness of defendant's statements in light of Saifuku's failure to provide *Miranda* warnings prior to questioning him in a "custodial" setting. Defendant's and Saifuku's recollections of the interview were essentially the same.

Moreover, several other witnesses provided testimony regarding the circumstances surrounding the January 30, 2005, crash, including Dr. Dahman, who testified defendant told him in the emergency room that he lost consciousness during the crash, and that he had lost consciousness three different times prior to this crash. Defendant told the paramedics on the scene that he lost consciousness during the crash. Saifuku's testimony played a minor role in the State's case.

The trial court did not err in limiting the scope of Saifuku's cross-examination. Although a defendant has the fundamental right to confront witnesses against him, a trial court may limit the scope of cross-examination. *People v. Bell*, 373 Ill. App. 3d 811, 818, 869 N.E.2d 807 (2007). "The latitude permitted on cross-examination is largely left to the discretion of the trial court and its determination 'will not be disturbed absent a clear abuse of discretion that resulted in manifest prejudice.' " *Bell*, 373 Ill. App. 3d at 818, quoting *People v. Quinn*, 332 Ill. App. 3d 40, 43, 772 N.E.2d 872 (2002). When impeaching a witness by showing bias, interest, or motive to testify falsely, the

evidence must give rise to the inference that the witness has something to gain or lose by his testimony. *People v. Harris*, 123 Ill. 2d 113, 147, 526 N.E.2d 335 (1988).

At trial, defendant suggested Saifuku might have been motivated to give false testimony in this case in order to "curry favor with his former employer and with any future employers." Defendant does not suggest what the false testimony might have been. The evidence that Saifuku was motivated to testify falsely in order to curry favor is too speculative and uncertain for us to hold the trial court abused its discretion in limiting the scope of cross-examination. See *People v. Buckner*, 376 Ill. App. 3d 251, 257, 876 N.E.2d 87 (2007).

IV. Jury Instructions

■ Defendant next contends the trial court erred by refusing to give the jury the complete IPI Criminal 4th No. 5.01B, which describes the mental state of "knowledge." See Illinois Pattern Jury Instructions, Criminal, No 5.01B (4th ed. 2000). Defendant asked the trial court to give IPI Criminal 4th No. 5.01B in its entirety for his aggravated reckless driving charge. The court provided the jury with paragraphs 1 and 3, but refused to give paragraph 2. We must determine whether the trial court abused its discretion with that ruling. See *People v. Mohr*, 228 Ill. 2d 53, 66, 885 N.E.2d 1019 (2008).

IPI Criminal 4th No. 5.01B:

"[1] A person [(knows) (acts knowingly with regard to) (acts with knowledge of)] the nature or attendant circumstances of his conduct when he is consciously aware that his conduct is of such nature or that such circumstances exist. Knowledge of a material fact includes awareness of the substantial probability that such fact exists.

■ A person [(knows) (acts knowingly with regard to) (acts with knowledge of)] the *result* of his conduct when he is consciously aware that such result is practically certain to be caused by his conduct.

■ [Conduct performed knowingly or with knowledge is preformed willfully.]" (Emphasis added.) Illinois Pattern Jury Instructions, Criminal, No. 5.01B (4th ed. 2000).

Count 2 of defendant's indictment said:

"[D]efendant *** committed the offense of AGGRAVATED RECKLESS DRIVING in that the defendant drove a motor vehicle with a willful and wanton disregard for the safety of persons or property in that the defendant operated a motor vehicle westbound on Lake-Cook Road at a time when the defendant knew he was subject to a medical condition which caused him to lose consciousness, and the defendant lost consciousness while operating his motor vehicle

westbound on Lake-Cook Road, thereby causing a motor vehicle accident, thereby causing great bodily harm to Sharon Tracy, in violation of 625 ILCS 5/11—503(c)."

Aggravated reckless driving requires the mental state of recklessness. See 625 ILCS 5/11—503(c) (West 2004). The statute defines recklessness as "a willful or wanton disregard for the safety of persons or property." 625 ILCS 5/11—503(c) (West 2004). The Committee Note for IPI Criminal 4th No. 5.01B says "[t]he bracketed third paragraph is for use in conjunction with offenses including a mental state of 'willfullness.'" Illinois Pattern Jury Instructions, Criminal, No. 5.01B, Committee Note, at 143 (4th ed. 2000). Because defendant's indictment charged him with a "willful and wanton" disregard for the safety of persons, paragraphs 1 and 3 of IPI Criminal 4th No. 5.01B were properly given.

The Committee Note also says:

"In cases where the instruction is given, use paragraph [1] if the offense is defined in terms of prohibited conduct. Use paragraph [2] if the offense is defined in terms of a prohibited result. If both conduct and result are at issue, use *both* paragraphs [1] and [2]." (Emphasis in original.) Illinois Pattern Jury Instructions, Criminal, No. 5.01B, Committee Note, at 142 (4th ed. 2000).

Defendant relies on *People v. Lovelace*, 251 Ill. App. 3d 607, 622 N.E.2d 859 (1993), to contend paragraph 2 of the instruction should have been given. *Lovelace* does not apply here. In *Lovelace*, the court held it was reversible error not to issue both paragraphs of the then-existing instruction where the indictment charged the defendant with knowingly causing great bodily harm and knowingly causing bodily harm to a peace officer as a *result* of his conduct. *Lovelace*, 251 Ill. App. 3d at 619. Here, defendant's indictment charged him with willfully and wantonly disregarding the safety of others when he drove while aware of his mental condition "thereby causing great bodily harm." The State was not required to prove defendant *knew* his conduct would result in great bodily harm. That is, the offense does not require proof that the defendant knew a certain result would occur. The instruction was proper as given.

V. Evidentiary Issues

A. Other Crimes Evidence

■ Defendant contends the trial court erred in allowing the State to introduce evidence of another crime, specifically, defendant's May 2004 crash in Glenview.

Generally, evidence of an uncharged bad act is not admissible to

show a defendant's propensity to commit a crime. *People v. Lopez*, 371 Ill. App. 3d 920, 936, 864 N.E.2d 726 (2007). Such evidence is admissible, however, if it is relevant for any other purpose. *People v. Wilson*, 214 Ill. 2d 127, 135-36, 824 N.E.2d 191 (2005); *Lopez*, 371 Ill. App. 3d at 936. The admissibility of other crimes evidence is within the sound discretion of the trial court and will not be reversed absent a clear abuse of that discretion. *Wilson*, 214 Ill. 2d at 136; *Lopez*, 371 Ill. App. 3d at 936.

Contrary to defendant's contention, evidence of the May 22, 2004, crash was relevant to establish defendant knew he had a condition that caused him to suddenly lose consciousness while driving. The circumstances surrounding the May 22 crash were inextricably intertwined with the issue of defendant's recklessness on January 30, 2005.

Georgia Botsis testified that following the May 22 crash, defendant sought medical advice to determine a diagnosis and treatment. Dr. Rosenbaum testified that based on the May 22 crash, he explained to defendant that defendant represented "the most high risk patients with neurocardiogenic syncope" because "he's already proven himself to have syncope while seated behind the wheel of a car." Dr. Levy testified he told defendant "not to drive" for a "[b]are minimum of six months with no episodes" in light of the May 22 crash.

Testimony regarding the circumstances of the May 22 crash was relevant to establish defendant was aware of his condition and to provide a basis for his doctors' instructions not to drive. The trial court did not err in admitting evidence of the prior crash.

B. Lay Witness Testimony

■ Defendant contends the trial court erred in allowing two lay witnesses to the crash to offer medical and legal opinions "well beyond their ken."

At trial, Mary Olincy testified she was driving westbound on Lake Cook Road when defendant's car collided with her car on January 30, 2005. Following several impacts, defendant's car came to a stop. Olincy testified she went to check on defendant and found him seated in the car even though it was on fire. Defendant was lurched against the seat, convulsing repeatedly, and obviously having "a seizure." Adrian Laboy testified he went to defendant's car to check on him after the crash. Laboy testified defendant was shaking, foaming at the mouth, unresponsive, and not acting normal. Laboy said defendant appeared to be "having some type of seizure or something."

"To be admissible, a lay opinion must be based upon the witness' personal observation and recollection of concrete facts; and such facts

cannot be described in sufficient detail to adequately convey to the jury the substance of the testimony." *People v. Terrell*, 185 Ill. 2d 467, 497, 708 N.E.2d 309 (1998).

In this case, Laboy's and Olincy's testimony described what they personally observed regarding defendant's condition immediately following the crash. Neither witness was attempting to offer a medical diagnosis. The trial court did not err in allowing the lay witness testimony. See *Terrell*, 185 Ill. 2d at 497.

C. Mandatory Reporting Requirement

■ Defendant contends he was erroneously barred from introducing, for impeachment purposes, the Illinois Secretary of State's mandatory reporting requirement of unsafe drivers. Defendant contends Dr. Rosenbaum was obligated to report him as a "high risk" driver. A trial court has discretion whether to admit or deny evidence based on a motion *in limine* and we will not disturb its decision absent an abuse of discretion. *People v. Bennett*, 376 Ill. App. 3d 554, 571, 876 N.E.2d 256 (2007).

The section of the Illinois Vehicle Code (Code) cited by defendant does not support his argument. See 92 Ill. Adm. Code. §1030.16(d), as amended at 33 Ill. Reg. 2391, eff. January 21, 2009. There is no statute or other regulation which imposes a mandatory reporting duty on doctors. Any impeachment value provided by the Code is marginal.

CONCLUSION

We affirm defendant's convictions and sentences.

Affirmed.

HALL and GARCIA, JJ., concur.