2022 IL App (2d) 200368-U
No. 2-20-0368
Order filed May 20, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kendall County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 18-CF-213 |
| NEHEMIAH WILLIAMS, | ) ) | Honorable Robert R. Pilmer, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BRENNAN delivered the judgment of the court.
Justices McLaren and Hudson concurred in the judgment.

**ORDER**

¶ 1   *Held*: The evidence was sufficient to support defendant's convictions for reckless homicide and failure to report an accident involving personal injury or death. Affirmed.

¶ 2   Following a bench trial, defendant, Nehemiah Williams, was convicted of reckless homicide and failure to report an accident involving personal injury or death. On appeal, defendant challenges the sufficiency of the evidence to support the convictions. For the following reasons, we affirm.

¶ 3                                    I. BACKGROUND

¶ 4    The victim, 26-year-old Amanda Stanton, was struck and killed by a car in the late evening hours of Saturday, June 23, 2018, as she was walking on Plainfield Road in Oswego after attending a wedding at a local venue. Her body was discovered early the next afternoon, on June 24, 2018, by a groundskeeper for a property off Plainfield Road.

¶ 5    Defendant was subsequently indicted on three counts: (1) failure to report an accident involving personal injury or death (625 ILCS 5/11-401(b) (2018)) (a class 1 felony) on grounds that he knowingly left the scene of an accident in which the victim "was killed as a result of that accident and thereafter failed to report the accident at a police station or sheriff's office near the place where the accident occurred, within one half hour after the accident"; (2) reckless homicide (720 ILCS 5/9-3(a) (2018)) (a class 3 felony) on grounds that he, "while acting in a reckless manner, performed acts likely to cause the death or great bodily harm to an individual, in that he operated a motor vehicle on a dark and unfamiliar road at night without wearing required corrective eye lenses," causing his car to strike and kill the victim; and (3) driving while his license was suspended (625 ILCS 5/6-303(d) (2018)) (a class 4 felony). Defendant pled guilty to driving while his license was suspended. On January 13, 2020, a two-day bench trial proceeded on the remaining two counts.

¶ 6                                    A. Trial

¶ 7    The witnesses at trial included a motorist who passed the victim prior to her death, the victim's mother and friends, the groundskeeper who discovered the victim's body, the investigating police officers, the owner of the car that defendant was driving, the passenger in the car, a witness who reported the location of the damaged car, a forensic pathologist who performed the victim's autopsy, and an optometrist who reviewed defendant's vision records.

¶ 8    The motorist who passed the victim on Plainfield Road, Nyia Cathey, testified that, around 11:30 p.m. on June 23, 2018, she was driving northbound on Plainfield Road toward Oswego. She described Plainfield Road as having a single lane in each direction with a small shoulder a "couple-feet" wide between the fog line and where the grass begins. There is also about six to eight inches of gravel on the edge of the shoulder before the full grassy area begins.

¶ 9    The speed limit in this section of Plainfield Road is 55 miles per hour. Cathey testified that she was driving approximately 50 miles per hour, as was another car about two car-lengths ahead. When the car ahead of her swerved into the oncoming lane, Cathey slowed to 40 or 45 miles per hour and looked to the right-hand side of the road to see the cause of the swerve. Cathey saw a person, who appeared to be a female, walking northbound in the grass area of the road. The person was wearing a short black dress and carrying her shoes; Cathey did not notice if the person was carrying a purse. Cathey was unable to see the person in her rearview mirror after passing her. There are no subdivisions, streetlights, or other lights in that stretch of Plainfield Road. Approximately one minute after passing the person, Cathey called 911 and reported the incident.

¶ 10    Plainfield patrol sergeant Ronald Mikos testified that, at approximately 11:30 p.m. on June 23, 2018, he was dispatched for a welfare check on a "[f]emale, white, black dress, carrying her shoes, walking down Plainfield Road." Mikos drove to the reported area on Plainfield Road but did not see a pedestrian. He also did not see any road construction or signs indicating road construction while en route. The video recording of Mikos's route that night, taken from the front-facing camera in his squad car, was admitted into evidence and played for the court. Mikos testified that, when he subsequently reviewed the video, he could see what was later learned to be the victim's body under a tree to the right of vehicle debris. The debris was between the fog line and the grass area.

¶ 11    Evidence regarding the search for the victim was introduced. On the morning of June 24, 2018, after the victim was reported missing, a group of the victim's family and friends walked along both sides of Plainfield Road near the wedding venue she had attended the evening before. Laura Kernbauer, the mother of the victim's boyfriend, testified that she parked near the driveway entrance to the venue. As she walked south on Plainfield Road—the same side of the road as the venue—she found a wristlet purse in the grass. The evidence established that the purse contained two cell phones, the victim's driver's license and credit card, $60 cash, a pair of sunglasses, and makeup. The purse appeared in good condition, and none of the items inside the purse were broken or cracked. A young woman in the search party stated that one of the phones belonged to her and took both phones from the purse. When the police arrived within an hour, Kernbauer showed police where she found the purse.

¶ 12    The groundskeeper for a property off Plainfield Road testified that, in the early afternoon on June 24, 2018, as he rode a lawn mower on the property, he stopped several times to pick up items from the ground. The items included some "car parts," a big piece of plastic, hair extensions, and a pair of women's shoes. He put all the items, except the shoes, in a plastic garbage bag. He brought the garbage bag to the house on the property and threw it in an outdoor trash can. He placed the shoes on the ground next to the trash can. The groundskeeper resumed mowing, and on his third cutting pass along Plainfield Road, he discovered an encased cell phone with a broken screen, later identified as the victim's cell phone. He stopped, picked up the phone, and resumed mowing. After driving for approximately another 10 feet, the groundskeeper saw a body under an evergreen tree; he had not seen the body the first two times he had passed the tree. He backed up, returned the cell phone to where he had found it, and notified the property owner. The property owner called the police. When the police arrived, the groundskeeper directed them to the location

of the body and cell phone and informed them about the other items he had discovered. The police retrieved the items and instructed the groundskeeper to return them to the location where he found them.

¶ 13    Kendall County Sheriff's Department investigator Bryan Harl, who processed the scene, described the stretch of Plainfield Road as "a two-lane highway that's marked with yellow lines in the middle." He explained that "[t]here's two fog lines, approximately three feet of pavement extending beyond the fog line to a grassy area or a ditch." There is "essentially no lighting," so "at nighttime all there would be would be the moonlighting and headlights coming from other vehicles." Harl described the area where the victim's body was found as a debris field with "a large amount of plastic, pieces of paint, things such as that." The tree under which the victim's body was found was located approximately 15 to 20 feet off Plainfield Road. Harl testified that the wedding venue was on the opposite side of the road from where the victim's body was found— about one-quarter to one-half mile away.

¶ 14    While searching the area, the police recovered a black-colored pair of women's underwear about 20 to 30 feet from where the purse was found (on the same side of the road as the wedding venue). Harl testified that the victim was not wearing underwear when her body was found. The victim's mother testified that she had been shown photographs of the underwear and that the underwear were neither the size nor preference of the victim. However, the victim's mother acknowledged that she did not know what underwear the victim wore or did not wear to the wedding and did not tell the police that the underwear did not belong to the victim. Both the purse and the underwear were sent to the Illinois State Police (ISP) laboratory for DNA analysis. The parties stipulated that DNA profile standards were properly obtained for both defendant and the victim and that an ISP analyst examined the purse swabs and identified genetic profiles for at least

four contributors to the genetic material on the purse but that none of the profiles were suitable for comparison to known DNA standards. The stipulation did not refer to the DNA analysis of the underwear.

¶ 15    Oswego resident Julia Heidank testified regarding a news report that she heard at some point between June 24, 2018, and June 26, 2018, regarding what was believed to be a hit-and-run fatal accident on Plainfield Road in Oswego. It was reported that law enforcement was looking for a 2004 or 2005 silver Chrysler Pacifica. Heidank was familiar with that type of vehicle because she had worked for a Chrysler dealership. She testified that, on June 26, 2018, while driving home from work at around 5:00 p.m., she stopped behind a few cars at a red light at the intersection of Fifth Avenue and Farnsworth Avenue in Aurora. When the light turned green, she drove slowly through the intersection and noticed a silver Chrysler Pacifica parked in the driveway of a house. The Pacifica's front, passenger-side bumper was hanging down. Heidank explained that the car was "right close to the side of the road, so it was pretty visible." However, there was a "vehicle blocking the side [of the Pacifica]," but "the front end was visible and the back end was visible." When Heidank arrived home, she reported the car to the Kendall County Sheriff's Office.

¶ 16    As a result of the tip, later that evening, on June 26, 2018, investigator Harl went to a house at the intersection of Fifth Avenue and Farnsworth Avenue in Aurora. Harl testified that a mechanic named Damien lived there. Harl explained that, on the driveway, there was "a white kind of panel van box truck" and "[f]urther to the south, closer to the house, behind that white panel van or box truck was a silver Chrysler Pacifica" parked parallel to Fifth Avenue. The box van was parked "[b]asically right off the roadway" between the Pacifica and the roadway. Harl testified that the Pacifica had substantial damage to the front passenger side, including a shattered windshield, broken headlight, a large dent, and a ripped wheel well. Harl further explained that

"[t]he front fascia of the vehicle was hanging" and retaining clips were missing, the "front quarter panel is dented and creased," the "hood is raised up approximately an inch or so from the quarter panel due to it being damaged," and "there is a notable damaged area of the lower passenger side of the windshield." Photographs of the damage were admitted into evidence.

¶ 17    Harl obtained a search warrant for the car, and it was towed to the sheriff's office. Inside the car, police officers found a driver's license for Eurydice Banford and an employee identification card and pay slips for defendant. While examining the damaged area of the windshield, Harl saw what appeared to be hair fibers and collected them. The parties stipulated that an ISP forensic analyst examined the hair fibers but found no apparent root or tissue on the hair, precluding further analysis. The parties also stipulated that an ISP forensic analyst collected swabs from a portion of the car's windshield, that an analyst identified at least one contributor of genetic material on the windshield swab, but that profile was unsuitable for comparison to a known DNA standard.

¶ 18    Banford—the owner of the Pacifica—testified that she had been in a romantic relationship with defendant since 2014 and had lived with him since 2018. In March 2018, Banford purchased a 2006 Chrysler Pacifica. Defendant borrowed the Pacifica during the evening of June 23, 2018, and told Banford that he was driving to his mother's house. Banford testified that the Pacifica had been in the repair shop earlier that month to fix the transmission but had no external damage when defendant borrowed it. The next day, on June 24, 2018, Banford saw defendant at their home, but not the Pacifica. Banford testified that defendant informed her that the Pacifica had further transmission problems and was getting fixed. However, two days later, on June 26, 2018, Banford received a telephone call from a police officer and learned that her car had been involved in an accident. Banford testified that she was upset and asked defendant for an explanation. Defense

counsel questioned Banford as to defendant's response, but the State objected on hearsay grounds, and the question was withdrawn.

¶ 19    The next day, on June 27, 2018, defendant met with investigator Harl at the Kendall County Sheriff's Office for approximately six hours. Two hours of the videotaped interview were played at trial, and the recording was admitted into evidence through the testimony of Harl. At the beginning of the interview, defendant told Harl that he borrowed Banford's car and went to see his mother and then his adult son. When he left his son's house sometime between 11 p.m. and 1 a.m., defendant said that he received a call from a woman named Stephanie whom he met on Facebook. They made plans to "hook up" with each other. Stephanie told him to meet her at a gas station near Parkway Drive in Oswego. He put "Parkway Drive, Oswego, Illinois" into his GPS. Defendant did not remember the route he took, but as he drove, he noticed some construction signs or cones. He said that he drove in the center of the lane with his eyes straight ahead on the road. Suddenly, he heard a "boom" and saw that the windshield was cracked. He thought something must have flown up and hit the windshield or that he hit a construction sign. He drove about half mile to a place where he could pull over and look at the car. He was worried about the damage and said that he did not want to tell Banford about it because she had recently spent $1100 to repair the car and had only owned it a few months. He also saw a broken headlight and was thus concerned about being pulled over (because he did not have a valid driver's license) and about the cost of towing the car. He therefore brought the car straight to his long-time mechanic named Damien who lives off Fifth Avenue in Aurora and fixes cars out of his driveway. Defendant felt comfortable dropping the car off overnight and talking to Damien about it the next day. Defendant's adult son picked him up from Damien's house.

2022 IL App (2d) 200368-U

¶ 20    In response to Harl's questioning as to whether he had been drinking or using drugs that day, defendant responded that he had not, as he was with his son, driving and "honestly, broke as s***." Defendant acknowledged that his "eyesight is kind of crazy" and he "need[s] glasses" but was not wearing them while driving on a "pitch black," unfamiliar, rural road at night. Initially, defendant stated that he did not know the name of the road on which the accident occurred but subsequently advised that it occurred on Plainfield Road. Defendant again told Harl that he thought he hit a construction sign or barrier, because he had seen construction on the road on which he had been driving just before he turned onto Plainfield Road.

¶ 21    Defendant stated that, when Banford informed him about the call from the sheriff's office, he apologized and told her that he hit a construction sign. Banford responded that she did not think she would be asked to come to the sheriff's office for that. This conversation prompted defendant to come to the sheriff's office that day. Defendant also stated that he had informed his mother that he was going to the sheriff's office because he hit something while driving but did not know what it was. In response, his mother said, "Please don't let it be that woman." Defendant said that he told his mother that he knew he hit something but did not hit somebody.

¶ 22    At this point, defendant asked Harl what he had hit. Harl responded, "You know exactly what you hit" and told defendant that he would feel better after admitting it. Defendant replied, "Please don't tell me it's what my mom said." Harl stated, "Here's the thing, you knew as soon as it happened, you knew, and I know that you know." Defendant responded, "That I knew what? That I hit somebody? When it, when it happened? No. No! Don't tell me that. Don't tell that it's what she said. Please don't tell me that!" At this point, defendant began to cry, and Harl told defendant that they needed to be open and honest with each other about what happened, not just for the two of them, but "for her." Defendant tearfully replied, "I didn't know I hit nobody, it was

dark out there." Harl stated that, although he may not have known when the impact happened, "at some point before you dropped off that car, you knew." Defendant maintained, "I hit something, not, not nobody."

¶ 23    Harl questioned, "[W]hen you got out of the car and you looked, you saw something up there, didn't ya? On the front end of the car?" Williams responded, "No, I didn't. No, I didn't. I didn't. I swear to God, on my life, on my, on my kids, I didn't see nothing. No, no like—I, I knew by the impact of the car, I knew I hit something. I didn't see nothing about nothing wrong with the car, I didn't see nothing on the car, it was just body damage! I swear to you!" Harl told defendant that anyone in their right mind, if they hit a person, would know that they hit a person. Defendant agreed but maintained that he did not know he hit a person, adding that his attention was on the broken headlight at that point.

¶ 24    Harl informed defendant that items belonging to the victim were found in the area and asked defendant whether his DNA or fingerprints would be found on the items. Defendant responded "no," because he did not touch anything. Rather, he got out of the car, saw the broken headlight, and got back in—all within about 10 seconds. Defendant said he did not see any blood or anything else indicative of hitting a person. He pointed out that he brought the car to his mechanic and left it outside near the road for days. Defendant maintained that he did not know that he hit a person and thought he hit something, perhaps a sign or mailbox.  Harl told defendant that his story was not credible, because there was no construction on Plainfield Road, and that defendant was making things worse for himself.

¶ 25    Harl also told defendant that he had prepared the victim's family for one of two scenarios— either  "some cold-hearted person smacked into their daughter and just left because they didn't give a s***" or  "it was a decent person who got scared." Harl stated, "Everybody in the world

realizes those are really the only two options. There is no option (C) where you hit a person and didn't know you hit a person. Everybody in the world knows that's not possible." In response, defendant grabbed a piece of paper on the table and began writing on it. Defendant explained that when the accident happened, he was actually driving Zephaniah Cummings and her two sons (ages one and six) to Cummings's mother's house. Defendant is the father of Cummings's six-year-old son. He wrote down Cummings's name and her mother's address. He stated that he was following Cummings's directions, not using GPS.

¶ 26    Defendant maintained that he knew he hit something, but did not know that he hit a person. He said that he did not pull over and look at the car until they arrived at Cummings's mothers' house, because it was dark and there was no shoulder on which to pull over. When he and Cummings looked at the car, he said that he must have hit a sign, a pole, or something, and Cummings agreed. Defendant continued to cry and stated that he did not know that he hit a person and would have tried to help the victim had he known. He added that he did not know that anything was on his car, nor had he seen or taken "whatever was left behind" off his car. Defendant reiterated that he did not stop immediately because it was dark and added that he needed glasses and they were not far from their destination. Defendant estimated that he was driving about 45 miles per hour at the time of the impact. He reiterated that he did not see anything that made him think he hit a person; rather, he felt the impact and saw that the windshield cracked. Based upon the damage to the car, he concluded that he thought he hit something.

¶ 27    Cummings testified that, on the evening of June 23, 2018, defendant drove her and her two sons from her home in Aurora to her mother's home in Oswego. Cummings sat in the back, passenger-side seat of the car with her one-year-old son; her older son sat in the back, driver-side seat. Cummings testified that she did not give defendant directions and was only "somewhat

familiar" with the route. She explained that she was not good with directions, did not drive, and did not have either a car or a driver's license.

¶ 28    Cummings described the road as unfamiliar and dark with no streetlights. She saw a car "a ways" in front of them heading in the same direction. Cummings testified that, as they were driving, she felt a "big boom," like something hit the car hard, but she did not see what hit the car. Based on the impact, she thought they hit a deer. Cummings did not see a person walking on the road and did not think that the car hit a person. She did not hear anything or see damage to the windshield. Cummings further testified that they continued to drive and "ran into a dead end" at which point defendant entered the address of Cummings's mother's house into the GPS of his phone. They drove to the house, which was about five minutes away from the "dead end."

¶ 29    Cummings testified that the first time they checked the car was when they arrived at her mother's house. She saw that a front headlight was missing, the hood was dented, and the bumper was hanging off the front of the car. Cummings did not see any hair, blood, or clothing on the car. Defendant drove away in the Pacifica about five minutes after dropping her and her sons at her mother's house.

¶ 30    Cummings acknowledged that, before trial, she told the prosecutor and the police that she noticed the windshield was cracked at the time it happened and that they drove "a little ways" after the impact and then stopped on the side of the road and checked the damage to the car. She explained that she was scared during those earlier interviews, because she knew "for a fact that we didn't stop when I felt the impact, we just kept going," and she thought it would be better to say that they had stopped. However, she testified that, because she had sworn to tell the truth at trial, the truth was that the first time they got out and checked the damage to the car was when they arrived at her mother's house.

¶ 31    Rob Brenart, a licensed optometrist, testified regarding his review of defendant's vision records. Defendant is nearsighted with astigmatism; his vision prescription was -1.25 in his right eye and -1.75 in his left eye. Without correction, defendant's vision is 20/70. This meant that when defendant is 20 feet away from an object, he could see it as clearly as a person with 20/20 vision would see it at 70 feet. Brenart also testified regarding the state standards for vision and driving. A person whose uncorrected vision is 20/70 or worse (meaning the second number is 70 or higher) is required to wear corrective lenses while driving during daylight hours. A person whose uncorrected vision is 20/40 or worse is required to wear corrective lenses while driving during nighttime hours. Defendant's driver's abstract from the Secretary of State's Office was admitted into evidence; the trial court took judicial notice that the abstract indicated that defendant has had a type B restriction on his license (since 2009)—a restriction that is added when the person is required to wear corrective eye lenses to drive.

¶ 32    Brenart explained that, for a person with defendant's vision, driving at night without corrective lenses, "[i]t would be harder to see details as they were coming up on the road. Reading street signs, telling if an object was closer, far, those types of reaction times would be reduced because the information wouldn't be clear." Brenart acknowledged that the 20/70 figure is "relevant to the small spacial details," not the size of objects, or "large spacial details." The clarity of "large spacial details" would be reduced, but there was no direct measurement for that reduction.

¶ 33    The forensic pathologist who performed the victim's autopsy, Kristin Escobar Alvarenga, opined that the victim's cause of death was "blunt force injuries due to pedestrian struck by vehicle." The blunt force injuries included skin injuries to the head, torso and extremities, pelvic fractures, fractures to the top of the skull, basilar skull fractures, pontomedullary (brain stem) laceration, subarachnoid and subdural hemorrhage, left femur fracture, and atlanto-occipital

dissociation. Based on the nature of the injuries, Alvarenga opined that the victim died immediately after being struck. Alvarenga further testified that the victim had a blood alcohol concentration of .22; however, the toxicology did not impact her opinion as to the cause of death.

¶ 34    Photographs depicting the condition of the victim's body were admitted into evidence. Alvarenga explained that the victim had a "gaping laceration of the scalp which exposes the skull," indicating that she struck the back portion of her head. The victim's skull was fractured, and there was blood on the surface of the brain. There was a hinge fracture on the base of the skull, "meaning that the front part of the base of the skull and the back portion of the skull is divided in half." In addition, the victim had injuries to her left hip consistent with being struck by a vehicle on the left side of her body. She had an injury to her left thigh with a laceration associated with a broken femur. There were large injuries to both calves and multiple fractures to the pelvis. The victim also had bruises and scrapes to her extremities. A "gray" paint chip was recovered from the victim's chest, and grassy debris was scattered on her body.

¶ 35    Following the close of the State's case, defendant moved for a directed finding of not guilty on both counts. The trial court denied the motion, and the case proceeded to closing arguments.

¶ 36                              B. Closing Arguments

¶ 37    With respect to the reckless-homicide charge, the prosecutor argued that, by choosing to drive on a dark road at night without corrective lenses, knowing that he was required to wear them, defendant consciously disregarded the risk that doing so would cause death or great bodily harm. Regarding the charge of failure to report an accident involving personal injury or death, the prosecutor asserted in closing argument that there was no reason that defendant would not have been able to see what hit the windshield and that the extensive damage to the Pacifica was evidence that defendant knew he hit a person. The prosecutor explained, "That front end pretty much

exploded. All the evidence markers on the scene, how many little pieces of plastic were scattered around that crime scene, the debris field. The hood was bent. Of course, the big huge impact on the windshield." And, "[t]o think he just drives away from that location and not know your bumper is hanging off is absolutely absurd." Moreover, the prosecutor asserted that the location of the victim's purse was proof that defendant knew he hit a person. The prosecutor posited that, after hitting the victim, defendant drove a short way down the road, got out to look at the damage to the car and saw the purse somewhere on the front end of the car, and then took the purse off and threw it across the street.

¶ 38    Defense counsel countered that there was no evidence of speeding or poor driving and pointed out that defendant's "low" prescription allowed him to legally drive during the day without corrective lenses. Defense counsel also argued that the State's theory regarding the purse was purely speculative and not based on any evidence. Indeed, the purse was discovered closer to and on the same side of the road as the wedding venue. Cathey (the motorist who reported a pedestrian on Plainfield Road) stated that the woman was carrying her shoes; there was no mention of a purse. Moreover, the two cell phones and other items inside the purse were in perfect condition, whereas the screen of the victim's cell phone, found near her body, was shattered.

¶ 39                                    C. Trial Court's Ruling

¶ 40    On January 15, 2020, the trial court issued its ruling, finding defendant guilty of both failure to report an accident involving personal injury or death and reckless homicide. In its oral findings, the trial court reviewed the witness testimony and stated that it had considered all evidence and all credible, relevant testimony. The trial court found each witness credible, with the exception of Cummings's testimony that defendant did not stop and check the car until they reached her mother's house. The trial court found Cummings's initial statement to police—that defendant

drove a short distance, checked the car, then got back in and kept driving—was more credible than her trial testimony. Nonetheless, the trial court found the remainder of Cummings's testimony credible.

¶ 41    Regarding failure to report an accident involving personal injury or death, the trial court found the State proved beyond a reasonable doubt that defendant was the driver of the car involved in a motor vehicle accident; the accident resulted in death; defendant knew an accident occurred; defendant knew that the accident involved another person; defendant failed to immediately stop his car at the scene of the accident and remain at the scene until performing the duty to give information and render aid; and defendant failed to report the accident within one-half hour after the accident at a nearby police station or sheriff's office.

¶ 42    In addressing defendant's knowledge that the accident involved a person, the trial court found:

> "While the defendant [] initially told the detectives he thought he had hit a construction sign, there is sufficient circumstantial evidence to infer that [defendant] knew that the accident involved another person, including the extent of the damage to the Chrysler Pacifica, the testimony of [] Cummings that the defendant stopped the vehicle a short distance later, got out of the car, and the discovery of [the victim's] purse some distance from the scene of the accident and on the opposite side of the roadway from the accident."

¶ 43    The trial court continued that "this circumstantial evidence is not sufficient to draw a different conclusion that [the victim] may have dropped her purse at some time before the accident."

¶ 44    Regarding reckless homicide, the trial court found the State proved beyond a reasonable doubt that defendant caused the victim's death by driving a motor vehicle recklessly in a manner likely to cause death or great bodily harm. As to recklessness, the trial court specified that defendant knew he was required to wear corrective lenses while operating a motor vehicle and failed to wear corrective lenses while driving during the late evening hours of June 23, 2018, thereby consciously disregarding a substantial and unjustifiable risk that circumstances exist or that a result would follow, and that such disregard constituted a gross deviation from the standard of care which a reasonable person would exercise in the situation. The trial court noted defendant's acknowledgment to police that he needed glasses to see while driving and that he was not wearing glasses during the late evening hours of June 23, 2018. The trial court also noted Brenart's testimony regarding defendant's 20/70 vision and the need to wear corrective eye lenses to drive at night. Accordingly, the trial court found defendant guilty of both failure to report an accident involving personal injury or death and reckless homicide.

¶ 45                              D. Posttrial Proceedings

¶ 46    Defendant timely filed a motion to reconsider the findings of guilt or a new trial on grounds of, *inter alia*, insufficiency of the evidence. On June 29, 2020, following a hearing, the trial court denied the motion. The case proceeded to a sentencing hearing that day, after which the trial court sentenced defendant to concurrent three-year prison terms for reckless homicide and driving while license suspended and a consecutive nine-year sentence for failure to report an accident involving personal injury or death. Defendant moved to reconsider the sentence; the trial court denied the motion. Defendant timely appealed.

¶ 47                                   II. ANALYSIS

¶ 48    On appeal, defendant challenges the sufficiency of the evidence to support his convictions. The State has the burden of proving beyond a reasonable doubt each element of an offense. *People v. Gray*, 2017 IL 120958, ¶ 35. A reviewing court faced with a challenge to the sufficiency of the evidence must determine "whether, [after] viewing the evidence in the light most favorable to the State, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Internal quotation marks omitted.) *Id.* The same standard for reviewing the sufficiency of the evidence applies to both jury trials and bench trials. *People v. Howery*, 178 Ill. 2d 1, 38 (1997). The reviewing court's role is not to retry the defendant. *Gray*, 2017 IL 120958, ¶ 35. Rather, it is the trier of fact's responsibility to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts. *Id.* Thus, a reviewing court will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses. *Id.* A criminal conviction will not be reversed unless the evidence is "so unreasonable, improbable, or unsatisfactory" that it leaves reasonable doubt of the defendant's guilt. *Id.*

¶ 49        A. Failure to Report an Accident Involving Personal Injury or Death

¶ 50    The offense of failure to report an accident involving personal injury or death is set forth in section 11-401 of the Illinois Vehicle Code (625 ILCS 5/11-401 (West 2018)). Section 11-401(b) provides:

> "Any person who has failed to stop or to comply with the requirements of paragraph
>
> (a) [regarding the stopping of a vehicle at the scene of the accident] shall, as soon as
>
> possible but in no case later than one-half hour after such motor vehicle accident, or, if
>
> hospitalized and incapacitated from reporting at any time during such period, as soon as
>
> possible but in no case later than one-half hour after being discharged from the hospital,

report the place of the accident, the date, the approximate time, the driver's name and address, the registration number of the vehicle driven, and the names of all other occupants of such vehicle, at a police station or sheriff's office near the place where such accident occurred. ***." *Id.* § 11-401(b).

¶ 51 Accordingly, the State was required to prove beyond a reasonable doubt that: (1) defendant was the driver of a vehicle involved in a motor vehicle accident; (2) the motor vehicle accident resulted in a death or personal injury; (3) defendant knew that an accident had occurred involving a person; and (4) no later than one-half hour after such motor vehicle accident, defendant failed to report the accident at a police station or sheriff's office near the place where the accident occurred. See *id.*; *People v. Digirolamo*, 179 Ill. 2d 24, 38-40 (1997). Defendant contests only whether the State proved beyond a reasonable doubt that he knew the accident involved a person.

¶ 52 Both sides cite our supreme court's decision in *Digirolamo*. There, the victim was struck and killed by a vehicle as he walked along the side of a road during the early morning hours while it was still dark outside. *Id.* at 28-29. His body was discovered by a police officer later that morning. *Id.* at 28. In connection with the incident, the defendant was convicted of, *inter alia*, failure to report an accident involving death pursuant to section 11-401(b). *Id.* The central issue raised on appeal was the requisite mental state to sustain the conviction. *Id.* at 39. The supreme court held that a conviction under section 11-401(b) requires proof beyond a reasonable doubt that the defendant knew not only that the vehicle was involved in an accident, but also that the accident involved another person. *Id.* at 41-42. Noting that the burden to prove this element is not "unrealistically difficult to sustain," the court stated, "The State can establish the requisite knowledge through circumstantial evidence. For instance, knowledge that another person was

involved in the accident may be imputed to a driver from the circumstances of the accident." *Id.* at 42.

¶ 53    In remanding for a new trial where the State would have the burden of proving that the defendant knew he hit a person, the court assessed the sufficiency of the evidence for double jeopardy purposes. *Id.* at 43-48. The evidence reflected that the defendant had been in an accident while driving his car, broke his windshield and sustained damage to the passenger side of his car as a result, and initially told police that he thought he struck a deer or that something was thrown at his car. *Id.* at 30-31. The defendant also initially told police that he did not stop after the accident, but he later stated that he did stop and look but left when he did not see anything. *Id.* at 31. The defendant admitted that he removed the damaged windshield from his car, although he stated that he did so to prevent his father from learning that he had been in an accident. *Id.* at 35. Soon after the accident, the defendant showed friends strands of hair that he found on the damaged windshield; the police later found human hair on the recovered windshield. *Id.* at 32, 34-35.

¶ 54    In holding that there was sufficient evidence of, *inter alia*, the defendant's knowledge that he hit a person for double jeopardy purposes, the court noted that the damage to the defendant's windshield suggested that the victim's body hit the windshield. *Id.* at 47. There was also testimony that, when hit, the victim's body would have flipped onto the hood of the car with the victim's head striking the windshield. *Id.* Thus, a jury reasonably could conclude that the defendant saw the victim's body strike the car before being thrown onto the ground. *Id.*

¶ 55    Moreover, the court reasoned that the defendant's actions after the accident could also support a finding that he knew he had hit a person. *Id.* at 47-48. The defendant appeared tense and nervous when discussing that he had been in an accident. *Id.* The defendant also acknowledged the possibility that he had hit a person and sought to conceal the accident by replacing the damaged

windshield of his car. *Id.* at 48. In sum, the court held that the evidence was sufficient to support a finding that defendant had the requisite mental state for a conviction under section 11-401(b). *Id.*

¶ 56    Similarly, here, considering the evidence in the light most favorable to the prosecution, we conclude that the record demonstrates sufficient evidence from which a rational trier of fact could have found beyond a reasonable doubt, based upon the circumstances of the accident, that defendant knew he hit a person. The damage to the Pacifica was significant—including a shattered windshield, broken headlight, dented and creased front quarter panel with the hood raised up approximately an inch from the quarter panel, ripped wheel well, and a bumper hanging off. As in *Digirolamo*, the damage to defendant's windshield, as well as the recovery of hairs from the windshield, suggested that the victim's head hit the windshield. Forensic testimony established that the victim's injuries were consistent with this theory. The victim's cause of death was "blunt force injuries due to pedestrian struck by vehicle." The victim had a "gaping laceration of the scalp" exposing her skull that was broken into several pieces, reflecting that the victim struck her head. Also, a "gray" paint chip was recovered from the victim's chest (the Pacifica was silver). Accordingly, a reasonable inference is that defendant saw the victim's body strike the car.

¶ 57    Given the extent of the damage to the Pacifica and the nature of the victim's injuries, the trial court was not required to accept the implausible explanation that defendant thought he hit a construction sign or other object. Indeed, the evidence demonstrated that there was no construction on Plainfield Road at the time. See *People v. Moreno*, 2015 IL App (2d) 130581, ¶ 19 (it was reasonable for the trial court to disbelieve the defendant's claim that he thought he hit a rock or a curb given the substantial damage to the passenger-side rear quarter panel of the defendant's car and the fact that the accident occurred in daylight in the middle of a busy intersection).

¶ 58    Defendant maintains that the damage to the Pacifica only supports an inference that he hit *something*, not *someone*, because he had no reason to expect an encounter with a pedestrian on a dark, rural road late at night. See *People v. Crego*, 395 Ill. 451, 461 (1946) (a "prudent person, in the exercise of ordinary care and caution" would not expect to meet a bicycle near the middle of a country road at midnight); *People v. Friesen*, 58 Ill. App. 3d 180, 185 (1978) (the late hour decreased the likelihood of an encounter with a pedestrian). Initially, we note that any purported diminished expectation of encountering a pedestrian would likewise have been present in *Digirolamo*—where the accident occurred in the dark, early morning hours. See *Digirolamo*, 179 Ill. 2d at 28-29. Yet the evidence there was still held to be sufficient to support an inference that the defendant knew that he hit a person. *Id.* at 47-48.

¶ 59    Moreover, as with the defendant's actions in *Digirolamo*, here, defendant's actions after the accident supported a finding that he knew that he was involved in an accident involving a person. First, defendant brought the Pacifica to his mechanic's driveway in the middle of the night. Defendant argues that there was no evidence of any attempt to block the view of the Pacifica from the road. Rather, defendant points out that Heidank described the car as "pretty visible" when she noticed it while driving through the intersection of Fifth Avenue and Farnsworth Avenue. Nevertheless, both Heidank and Harl described the Pacifica as being partially obscured by, respectively, another "vehicle" or a "van or box truck."

¶ 60    Additionally, defendant repeatedly lied about his actions on the night of the accident, demonstrating consciousness of guilt. See *People v. Walker*, 2020 IL App (4th) 180774, ¶ 93 (lying to the police is evidence of consciousness of guilt). Defendant did not mention the accident to Banford and told her that the Pacifica needed transmission repair. Defendant suggests that this lie was to avoid alerting Banford that he was with another woman at the time of the accident "and

possibly engaging in infidelity." Defendant, however, also told a series of lies to police. When questioned by Harl, defendant first maintained that he was alone in the car at the time of the accident and meeting a woman at a gas station in Oswego for a "hookup." Eventually, defendant changed his story and told Harl that he was in the car with Cummings and her two sons. Defendant also initially told Harl that he drove for about a half mile after the accident and then pulled over to check the damage. He subsequently contradicted himself and stated that he did not stop the car and view the damage until he reached Cummings's mother's house in Oswego.

¶ 61    Defendant proposes that he lied to police for other reasons—he was driving without his required corrective eye lenses, his driver's license was suspended, and he left the scene of an accident involving property damage. He argues, in turn, that *general* consciousness of guilt does not demonstrate consciousness of guilt for failure to report an accident involving personal injury or death. This argument is unpersuasive, as identifying the reason a defendant exhibited guilty behavior is "a fact question for determination by the trier of fact." *People v. Phillips*, 2015 IL App (1st) 131147, ¶ 22. Our role is not to retry defendant. See *Gray*, 2017 IL 120958, ¶ 35. In sum, defendant's actions after the accident supported the finding that he knew that he was involved in an accident involving a person.

¶ 62    As a final matter, defendant challenges the finding that he stopped the car after the accident and threw the victim's purse to the other side of the road, arguing that this theory amounted to mere speculation. Accepting for the sake of analysis that this was not a reasonable inference from the evidence, for the reasons set forth above, the remaining evidence was not so unreasonable, improbable, or unsatisfactory that it leaves a reasonable doubt of defendant's guilt. See *id.* Accordingly, we reject defendant's challenge to the sufficiency of the evidence to support his conviction for failure to report an accident involving personal injury or death.

¶ 63                              B. Reckless Homicide

¶ 64    A reckless homicide conviction requires proof beyond a reasonable doubt that: (1) the defendant was operating a motor vehicle; (2) the defendant unintentionally caused a death while operating the vehicle; and (3) the acts which caused the death were performed recklessly so as to create a likelihood of death or great bodily harm to some person. See 720 ILCS 5/9–3(a) (West 2018)); *People v. Wilson,* 143 Ill. 2d 236, 245 (1991). The reckless homicide statute does not require that a defendant deliberately intend to kill a person. *Wilson,* 143 Ill. 2d at 246. Rather, a defendant commits reckless homicide, even if the defendant unintentionally kills, and even in the performance of a lawful act, while conducting oneself recklessly. *Id.*

¶ 65    Defendant contends that the State failed to prove that his actions were reckless such that he created a likelihood of death or great bodily harm to a person. Recklessness is defined as follows: "A person is reckless or acts recklessly when that person consciously disregards a substantial and unjustifiable risk that circumstances exist or that a result will follow, described by the statute defining the offense; and that disregard constitutes a gross deviation from the standard of care that a reasonable person would exercise in the situation." 720 ILCS 5/4–6 (West 2018). Recklessness "may be inferred from all of the facts and circumstances in the record viewed as a whole and may be established by the defendant's physical condition." *People v. Botsis*, 388 Ill. App. 3d 422, 429 (2009).

¶ 66    In *Wilson*, for instance, the defendant was convicted of reckless homicide after the car he was driving crossed the center line on a highway and collided with an oncoming vehicle, killing a passenger in the defendant's car. 143 Ill. 2d at 239-40. Our supreme court rejected the defendant's sufficiency-of-the-evidence challenge, where medical testimony established that the defendant had been diagnosed with a sleep disorder of which he had been aware for years prior to the collision;

he had long suffered from excessive drowsiness; and the defendant's recent weight gain had exacerbated the condition. *Id.* at 247-48. Citing authority for the proposition that criminal recklessness may be found where a defendant chooses to drive an automobile despite knowledge of a condition that could cause drowsiness or loss of consciousness at the wheel, the court reasoned that "a driver may be guilty of a crime in undertaking to drive when he knows he may black out or lose consciousness." *Id.*

¶ 67 Accordingly, our supreme court held that the defendant's choice to operate an automobile "with the knowledge that he suffered from a condition that made it dangerous for him to drive," supported a finding of recklessness on that basis alone. *Id.* at 248-49. The court further noted that evidence of recklessness was compounded where the defendant aggravated his condition by voluntarily consuming alcohol prior to driving. *Id.* at 249-50.

¶ 68 The appellate court in *Botsis* similarly rejected the defendant's challenge to the sufficiency of the evidence to support his reckless homicide conviction. *Botsis*, 388 Ill. App. 3d at 430-31. There, the defendant was driving to work on Lake Cook Road in the late afternoon when he lost consciousness. *Id.* at 425. His car crossed from the westbound lane of traffic into the eastbound lane and hit several other cars, killing one person and injuring another person. *Id.* There was no evidence of alcohol or drug use. *Id.* at 425-28. During the year leading up to the accident, the defendant had been diagnosed with neurocardiogenic syncope and a seizure disorder and instructed by physicians not to drive. *Id.* He had at least three prior fainting incidents, including, within the year prior to the accident, an incident that resulted in a minor crash. *Id.*

¶ 69 The appellate court concluded that, like the defendant in *Wilson*, the defendant "chose to operate an automobile knowing he suffered from a physical condition that made it extremely dangerous for him to drive." *Id.* at 431. The medical testimony established that the defendant knew

he could experience a blackout without warning while driving, was instructed not to drive, and never received permission to resume driving. *Id.* The defendant nevertheless chose to drive, resulting in his loss of consciousness while behind the wheel of his car and a collision that ended in injury and death. *Id.* Accordingly, the entirety of the evidence established that the defendant acted with a conscious disregard of a substantial risk that he would cause great bodily harm or death by driving. *Id.*

¶ 70    Likewise, here, the evidence established that defendant knew that he had a medical condition that made it dangerous to drive at night. It was undisputed that defendant had a type B restriction on his license since 2009—a restriction that is added when the person is required to wear corrective eye lenses to drive. See 92 Ill. Adm. Code 1030.70(b), (c), (d) (eff. Jan. 1, 2009); 1030.92 (eff. June 8, 2018). Thus, while even a lawful act committed recklessly may suffice to establish reckless homicide, defendant here committed an *illegal* act by driving at night without his corrective lenses. See 625 ILCS 5/6-113(e) ("It is unlawful for any person to operate a motor vehicle in any manner in violation of the restrictions imposed on a restricted license or permit issued to him."), 6-601(a) ("It is a petty offense for any person to violate any of the provisions of this Chapter unless such violation is by this Code or other law of this State declared to be a misdemeanor or a felony.") (West 2018).

¶ 71    Defendant likens his need for corrective eye lenses to a need for over-the-counter reading glasses. However, as the State points out, defendant "was not attempting to read a menu in a dark restaurant but was driving a 2 ton vehicle in lanes of traffic occupied by other drivers." Brenart, the optometrist, explained that, for a person with defendant's 20/70 vision, driving at night, without corrective lenses, would make it harder to see details (such as a pedestrian along the road) as he approached. Brenart further explained that reaction times for a person with defendant's vision

would be reduced at night. In his statement to police, defendant explicitly acknowledged his "crazy" eyesight and need for glasses. Defendant nonetheless chose to drive, without glasses, on a dark, unfamiliar, rural road at night, without knowing where he was going—a concern buttressed by the restriction on his driver's license. Under these particular facts and circumstances, it was not unreasonable for the trial court to find that defendant consciously disregarded a substantial and unjustifiable risk that he would cause great bodily harm or death and that such disregard constituted a gross deviation from the standard of care that a reasonable person would exercise in the situation.

¶ 72    Defendant persists that the facts and circumstances of his case are comparable to those of cases in which reckless homicide or involuntary manslaughter convictions were reversed where the defendant's conduct was not likely to cause death or where the defendant could not have anticipated the victim's own reckless conduct. See, *e.g.*, *Crego*, 395 Ill. at 458-63 (while the defendant drove his car at night on a country road with only parking lights, the evidence established that the victim was riding a bicycle without lights or reflectors on the road); *People v. LaCombe*, 104 Ill. App. 3d 66, 72-74 (1982) (while the defendant drove his truck on a school athletic field at night without lights, the evidence established that the victim climbed out of the window, lost his grip, and fell beneath the wheels of the truck); *Friesen*, 58 Ill. App. 3d at 183-86 (while the defendant drove his car at night with only parking lights, he did so slowly in a residential, *albeit* "hilly," district, and the evidence established that the pedestrian whom he struck was walking in the street on the wrong side of the roadway); *People v. Frary*, 36 Ill. App. 3d 111, 114-15 (1976) (while the defendant was speeding and failed to maintain safe interval between his vehicle and the motorcycle he was following, the motorcycle driver lost control, and the defendant could not have known the direction the motorcycle would veer as he swerved to avoid the collision).

¶ 73    Here, however, as discussed, the evidence was sufficient to establish that defendant consciously disregarded a substantial risk that he would cause death by illegally driving at night without glasses on a dark and unfamiliar road. Moreover, there was no evidence that the victim was *in* the roadway at the time defendant struck her (like the victims in *Crego* and *Friesen*). Indeed, there was evidence that other motorists saw the victim, but were able to avoid her, including Cathey (who called 911 to report a pedestrian on Plainfield Road) and the motorist in the car that swerved ahead of Cathey. Cathey testified that the victim was walking in the grass area of the road, not on the road. Defendant speculates that the victim could have later walked in the gravel area or on the road yet acknowledges the "logical appeal" of the "State's assertion that [the victim] would be likely to stay in the grass because she was barefoot and would not want to walk on gravel." Defendant cites nothing in the record to support a contrary inference.

¶ 74    Ultimately, "the acts of the defendant and not the victim are those against which the standard of recklessness must be measured" (see *LaCombe*, 104 Ill. App. 3d at 74), and "[c]ases of this kind will turn upon the particular facts in the case" (see *People v. Giere*, 192 Ill. App. 3d 520, 528 (1989)). The evidence established that defendant drove at night with impaired vision and no corrective lenses in violation of his restriction. His own words demonstrated that he was well aware of his "crazy" eyesight and need for glasses. Yet defendant drove in violation of the law, without knowing where he was going, on a dark and unfamiliar at night. Accordingly, as discussed, the evidence, taken as a whole, was sufficient to establish defendant's recklessness.

¶ 75    Defendant contends, as a final matter, that even if he were reckless, the State did not sufficiently prove that his recklessness "was a contributing cause of [the victim's] death and that her death did not result from a cause unconnected with [his] reckless act"—the cause being the victim's conduct of walking on the road with her back to oncoming traffic while intoxicated. The

State was not required to prove that defendant's reckless acts were the sole and immediate cause of death; rather, the State was required to prove that they were a contributing cause such that death did not result from a cause unconnected with the acts. *People v. Nere*, 2018 IL 122566, ¶¶ 31-32, 35, 66-67; *People v. Ethridge*, 243 Ill. App. 3d 446, 465 (1993). Defendant fails to articulate a basis upon which to conclude that such proof was lacking.

¶ 76 In sum, we conclude that the evidence was not so unreasonable, improbable, or unsatisfactory that it leaves a reasonable doubt of defendant's guilt. We therefore reject defendant's challenge to the sufficiency of the evidence to support his reckless homicide conviction.

¶ 77 III. CONCLUSION

¶ 78 For the reasons stated, we affirm the judgment of the circuit court of Kendall County.

¶ 79 Affirmed.